[Civ. No. 48540. Second Dist., Div. Two. Oct. 5, 1977.]

REX L. ENDICOTT, Plaintiff and Appellant, v.
NISSAN MOTOR CORPORATION et al.,
Defendants and Respondents.

## COUNSEL

Heily, Blase, Ellison & Wellcome, Lascher & Wilner and Edward L. Lascher for Plaintiff and Appellant.

Grace, Neumeyer & Otto, John Carpenter Otto, Richard A. Neumeyer, Arthur Paul Berg, Archbald, Zelezny & Spray, Archbald & Spray, Maurice A. Greenwald, Don Dewberry and Kenneth Carroll for Defendants and Respondents.

## OPINION

**FLEMING, Acting P. J.**—Product liability action arising out of the rupture of an allegedly defective lap seat belt in plaintiff's 1967 Datsun 411 automobile. The belt broke when plaintiff lost control of the car on an icy winding road, and the car struck an embankment and rolled over. Plaintiff appeals (1) the court's order denying his motion for a new trial following unanimous jury verdicts in favor of defendants Nissan Motor Corporation (manufacturer and American distributor of the automobile) and Turnbull & Gamble (the retail seller), and (2) the court's order at the close of plaintiff's case granting a motion for nonsuit by defendant Vehicle Maintenance & Painting Co. (the installer of the seat belt). Plaintiff assigns as error: first, the court's refusal to give plaintiff's requested instruction No. 5 putting the burden on defendants to prove that the rupture of the seat belt did not enhance plaintiff's injuries;[1]

---

[1] The requested instruction read as follows:

"Plaintiff's Requested Instruction No. 5

"At the time the 1967 Datsun 411 vehicle was imported into the United States by Nissan Motor Corporation in U.S.A., delivered to the dealer, Turnbull and Gamble, and sold to the plaintiff, Rex Endicott, section 27300 of the official California Vehicle Code was in full force and effect.

"That section provided as follows:

"'Any safety belt or safety harness installed in a vehicle and large enough to accommodate an adult person shall be designed and installed in such manner as to prevent or materially reduce the movement of the person using the same in the event of collision or upset of the vehicle.'

"If you determine, in light of all the evidence, that the seat belt in the Endicott vehicle

second, the court's refusal to instruct the jury that plaintiff's contributory negligence, if any, was not a defense to this product liability action;[2] third, the grant of the motion for nonsuit and the court's refusal to permit plaintiff to amend his complaint at the close of his case to allege negligence on the part of the installer; and finally, the admission in evidence of a sequence of movie film prepared by Nissan (the crash test film), which plaintiff alleges was irrelevant and highly prejudicial.

## FACTS

Plaintiff purchased his automobile on 14 December 1967. The accident occurred after dark on the evening of 14 December 1969, when plaintiff was driving his accustomed route from his home in Oxnard to the naval base at Lemoore where he was then stationed. His route lay over a mountainous and curving stretch of Highway 33. About 30 miles north of Highway 101, while driving at a speed of 50 to 60 m.p.h., plaintiff struck a patch of ice on a curve, lost control of his automobile, and skidded. Plaintiff testified that at the time he was wearing his seat belt snugly fastened, a fact corroborated by testimony that the belt when located in plaintiff's vehicle after the accident was ruptured and had its buckle fastened. Plaintiff testified that when he went into the skid he lost consciousness momentarily and remembers nothing until he found himself lying face down on the ceiling inside his overturned vehicle. The investigating Highway Patrol officer found the automobile lying on its top, and accident reconstruction experts testified that probably the front end of the automobile struck a mud embankment along the highway and thereafter the vehicle rolled over. Severe damage to the front end of the

---

separated in the accident of December 14, 1969 by virtue of a defect in the seat belt restraint system, and that the seat belt failed to prevent or materially reduce the movement of the plaintiff in the accident, then, in that event, the defendants Nissan Motor Corporation in U.S.A. and Turnbull and Gamble were in violation of section 27300 of the California Vehicle Code.

"Under such circumstances, if defendants contend that the plaintiff would have sustained injuries even if the seat belt had held, the burden is on the defendants to affirmatively prove, by a preponderance of the evidence, the nature and extent of the injuries, if any, the plaintiff would have thus sustained.

"*Vehicle Code* § *27300* (enacted 1959, repealed 1968)

"*Haft v. Lone Palm Motel,* 3 Cal.3d 756."

[2]"Plaintiff's Special Instruction No. 1

"There is no issue in this case as to any negligence on the part of Mr. Endicott. The fact that he may have started the chain of events in motion leading up to the accident does not in any manner affect his right to recover if you find that the defective seat belt or seat belt design was a substantial factor in bringing about his injuries. Further, the amount of damages, if any, to which he is entitled shall in no way be affected or reduced because he may have been the original factor that started the accident in motion."

vehicle tended to indicate a violent head-on impact. According to the Highway Patrol officer, the front grill was mashed in, the midsection of the vehicle was dented, and the roof metal was "creased." The scene was dark, no photographs were taken, and the vehicle itself was never recovered from the wrecking yard to which it was taken. The only available evidence of the appearance of the vehicle after the accident consisted of photographs taken by plaintiff, by his son-in-law, and by an insurance adjuster at the wrecking yard.

Plaintiff testified he managed to crawl out of the vehicle; and the patrol officer found him lying on the road. As a result of the accident plaintiff suffered a traumatic subluxation of his lower back, was deemed physically unfit for further naval duty, and was ultimately discharged as disabled.

Plaintiff was not aware the belt had ruptured until his son-in-law about a week after the accident went to the yard where the vehicle was stored to recover plaintiff's personal property. The next week the son-in-law removed the right-hand portion of the seat belt from the vehicle, using tools to remove the bolted portion from the floor, but did not remove the left-hand portion of the belt. Subsequently, plaintiff's experts destroyed part of the recovered seat belt so that its remaining length was insufficient to determine whether it satisfied federal safety standards. Because of concededly poor investigative procedure it became impossible to discover the condition of the fractured portion of the belt at the time of the accident.

Several expert witnesses testified to possible causes of the seat belt rupture. Plaintiff's theory was that the belt webbing was severed by the upper edge of a metal L-shaped bracket which in the 1967 Datsun 411 was located on the outer side of each front bucket seat and served to join the back and bottom of each seat. Experts on both sides testified that contact between belt webbing and an exposed piece of metal such as the L-shaped bracket would be less than optimal design practice and would increase the risk of abrasion and rupture of the belt, but the experts disagreed whether the seat belt in this vehicle could have ridden up over the top of the bracket and ruptured in the manner claimed. The belt showed a crescent-shaped indentation or "signature" on the webbing just below the point of fracture; there was some similarity between the shape of this signature and either the top of the L-bracket or a hat-shaped washer located under the seat of the car. However, the length of the belt made it impossible for the indented portion to have

contacted the hat-shaped washer, and defendants' experts testified the mark did not exactly match the top of the L-bracket. Nissan's principal expert witness, Professor Hurt, thought it highly probable the belt had been damaged before the accident. A chemistry and fibers expert testifying for Nissan expressed an opinion based on his microscopic examination of the ruptured belt fibers that the L-bracket could not possibly have caused the belt to rupture.

Plaintiff, attempting to prove he had been injured more seriously than he would have been if the seat belt had held, testified that when he had had a previous head-on crash in a Datsun, the lap belt did not rupture, and he walked away uninjured. One of his expert witnesses purported to establish through probability charts that serious injury is more likely to occur to unbelted than to belted motor vehicle accident victims, because their forward acceleration is abruptly halted by collision with the vehicle's interior, instead of being gradually decelerated with the vehicle. Plaintiff, however, could not produce a witness to testify that his subluxation injury would not have occurred but for the seat belt rupture. An additional complicating factor in plaintiff's claim was his long history of back injury and treatment, which included a prior laminectomy and spinal fusion to correct a ruptured disc. Plaintiff's principal witness on injuries, an orthopedic surgeon, testified that a subluxation like plaintiff's was possible in a collision similar to plaintiff's even when the seat belt held. For the defense, Professor Hurt testified that physical damage to the steering wheel and dash of plaintiff's vehicle indicated extreme forward flexion of plaintiff's torso while his lower body was restrained, suggesting that plaintiff probably sustained severe injuries before the belt gave way. Deformation of the steering wheel indicated a human body had come in contact with it.

In the crash test film, whose admissibility plaintiff contests, Datsun 411s, equipped like plaintiff's with L-bracket seats, were driven head-on into a concrete barrier, with dummies of plaintiff's approximate weight belted in the front seats. Although the belts did not rupture in the film, the upper torsos of the dummies were thrown about so violently as to strongly suggest the possibility of severe upper torso injuries. After viewing this film plaintiff's medical witness expressed the opinion that such severe flexion could produce back injury, although in his view this was not likely. Plaintiff's counsel regarded the film as highly prejudicial because of the repeated, violent exhibitions of probable injury even when the belts held; and he stated that the simulated accident conditions were dissimilar to those of the actual event. The accident, as stated,

probably initiated with an impact of 50 to 60 m.p.h. into a dirt embankment followed by a roll-over of the vehicle. Reconstruction experts agreed that the major impact to plaintiff's vehicle was the head-on crash and that the most serious damage to the vehicle occurred at the front end. The simulated series of crash tests consisted of a head-on crash into a concrete barrier. Because such a barrier has less give than a dirt embankment and thus produces more violent deceleration, it was necessary to adjust the speed of the test vehicles to something less than plaintiff's actual speed in order to simulate the actual crash. Professor Hurt effected this by crashing vehicles into the barrier at various speeds until he produced front-end damage similar to that which actually occurred to plaintiff's vehicle. This condition resulted at test speeds close to 30 m.p.h. When dummies of plaintiff's weight were belted into test vehicles which were crashed head-on into the barrier, the seat belts held. The test vehicles were not rolled over, but experts for both sides testified that the maximum force on the seat belt was probably generated during the head-on impact rather than during the vehicle's roll-over. Professor Hurt testified that the inertial forces affecting the vehicle and its occupant in a head-on collision with an embankment would be the same as those in the crash sequence depicted. After lengthy discussion and preview in chambers, the court allowed the film in evidence. Plaintiff contends the film does not duplicate accident conditions because the seat belt and L-bracket interacted to bring about the rupture during the roll-over maneuver, but Professor Hurt testified the belt could not tear on the upper edge of the L-bracket regardless of the vehicle's position.

The evidence showed that Vehicle Maintenance (Installer) was an independent contractor hired by Nissan to install accessories on its vehicles, including installation of seat belts. When a vehicle arrived in California, its belts were already in the trunk of the vehicle, and the locations for their installation were marked. Installer's employees took the belts out of the trunk and attached them to the vehicle according to the manufacturer's directions. The manufacturer supplied all materials for attaching the belts. There was no proof that Installer had, or should have had, any knowledge about the design of seat belts in general or those of the Datsun 411 in particular, or proof that the possibility of the seat belt riding up over the L-bracket was so obvious that any reasonable installer should have refused to install the belts. The court pointed out that the alleged defect had not even been apparent to plaintiff's expert—except as an afterthought. Installer's motion for nonsuit was granted on the ground it had not supplied any product for whose defects

it could be held liable. The court denied plaintiff's motion to amend his complaint to plead an action against Installer for negligence, both because there was no evidence of negligence and because plaintiff's motion to amend his complaint had come too late, in that plaintiff's negligence would then become relevant, and Installer would have had no opportunity to cross-examine plaintiff's witnesses on negligence during plaintiff's case in chief.

## DISCUSSION

1. ▇▇ The trial court instructed the jury that the burden remained on plaintiff to prove that rupture of the seat belt enhanced plaintiff's injuries, and the court refused to instruct the jury that defendants had the burden of proving a negative, i.e., that rupture of the seat belt had not enhanced plaintiff's injuries. Plaintiff claims the existence of a substantial probability (equivalent to a presumption) that rupture of the seat belt had aggravated his injuries, and therefore the burden of rebutting this presumption shifted to defendants. Some general discussion of product liability as it relates to motor vehicles becomes appropriate.

▇▇ The general rule declares that an automobile manufacturer is liable for defective design in its product that results in personal injuries. (*Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1 [116 Cal.Rptr. 575]; see *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1094].) ▇▇ Although a defect need not be the cause of a motor vehicle accident in order to allow plaintiff to recover for injuries resulting from that defect (*Cronin* v. *J. B. E. Olson Corp.* (1972) 8 Cal.3d 121, 127 [104 Cal.Rptr. 433, 501 P.2d 1153]), and although motor vehicle accidents are foreseeable hazards whose possibility an automobile manufacturer must keep in mind when designing vehicles (*Self* v. *General Motors Corp., supra,* 42 Cal.App.3d 1), it is a necessary prerequisite to recovery for defective design that the defect be a substantial contributing factor to plaintiff's injuries (*Cronin* v. *J. B. E. Olson Corp., supra,* 8 Cal.3d at p. 127). If the violence of a crash is the effective efficient cause of plaintiff's injuries to the extent that it supersedes other factors such as defective design and makes them immaterial, plaintiff cannot recover. (*Self* v. *General Motors Corp., supra,* 42 Cal.App.3d 1, 9.) For example, where a plaintiff who had driven his microbus off the road and hit a telephone pole head-on claimed the design of the rear-engine microbus contributed to his injuries, the court found no substantial evidence to sustain a finding of enhanced injury, in

that plaintiff would have suffered serious injury regardless of engine location. (*Dreisonstock* v. *Volkswagenwerk, A.G.* (4th Cir. 1974) 489 F.2d 1066, 1076.) In some cases a relationship between the design defect and plaintiff's injuries will be immediately apparent, as for example in *Horn* v. *General Motors Corp.* (1976) 17 Cal.3d 359 [131 Cal.Rptr. 78, 551 P.2d 398], where a defective cap came off the horn in the steering wheel and exposed sharp prongs which raked plaintiff across the face and caused injuries that otherwise would not have occurred. In seat belt cases, however, although there is undoubtedly a statistical correlation between absence of seat belt (or rupture due to defect) and increased injuries in motor vehicle accidents, expert testimony will normally be necessary to establish proximate cause of injury on the individual facts. (See *Truman* v. *Vargas* (1969) 275 Cal.App.2d 976, 983 [80 Cal.Rptr. 373].) ▮ At bench, no substantial evidence supported a finding of proximate cause of injury sufficient to shift the burden of proof. Plaintiff's evidence merely presented a general probability of enhanced injury from nonuse of seat belts. Although contributory negligence does not normally constitute a defense in a product liability cause (*Luque* v. *McLean* (1972) 8 Cal.3d 136, 145 [104 Cal.Rptr. 443, 501 P.2d 1163]), we have a factual situation at bench in which plaintiff's operation of his automobile, negligent or not, was the overriding cause of the serious accident that brought him severe injury. No witness, including plaintiff's medical experts, could say with any degree of certainty that plaintiff would not have sustained severe and disabling injuries if the belt had not ruptured, and plaintiff's medical expert even conceded the possibility that the very back injury that plaintiff suffered could have so occurred. What is more, the experts had great difficulty in reconstructing the probable sequence of events in the accident, particularly with reference to the exact point at which the belt ruptured. These facts wholly preclude any demonstration of substantial probability of causal link between design of seat belt and enhancement of plaintiff's injuries Accordingly the circumstances sufficient to justify a shift in the burden of proof never arose.

This cause bears little resemblance to *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756 [91 Cal.Rptr. 745, 478 P.2d 465], relied on by plaintiff. In *Haft,* a father and son drowned in a motel pool where, in violation of statutory law, no lifeguard had been provided. There were no witnesses. Under those circumstances the court held that the very violation of the statute—the failure to provide a lifeguard—made it impossible for plaintiff to prove the cause of the drownings; hence the burden fell on defendants to prove that the drownings would have occurred even if a lifeguard had been provided. The facts in *Haft* differ from those at bench

in two essentials. First, as the court noted in *Haft,* the factual setting "establishe[d] a significant probability of a successful rescue," i.e., the presence of a lifeguard would in all probability have prevented the drownings. (3 Cal.3d at p. 773.) At bench it would be pure speculation to assume that differently designed seat belts would have prevented plaintiff's injuries, for the testimony of possible prior damage to the seat belt, the conflict of opinion on the cause and timing of the rupture, and the difficulty in predicting what plaintiff's injuries would have been in so serious an accident if his seat belt had not ruptured, preclude any finding of significant probability of seat belt rupture as the proximate cause of enhanced injuries. In the absence of any such significant probability, it remained inapposite to change the burden of proof on a major aspect of plaintiff's cause of action—the proximate cause of his injuries. Second, unlike *Haft,* the design of the seat belt, defective or not, has nothing to do with the difficulty of proving enhanced injuries. *Haft* is simply not pertinent. (*Smith* v. *Americania Motor Lodge* (1974) 39 Cal.App.3d 1, 5-7 [113 Cal.Rptr. 771].)

We agree with the trial judge that no general rule exists in the field of product liability requiring the manufacturer of a defective product to prove a negative—his noncausation of plaintiff's injuries. Additionally, we are of opinion that the evidence in this cause is so weak that plaintiff did not even carry his burden of proving the existence of a defective product to whose flaws he attributes the cause of his injuries.[3] But we are not required to go that far. To decide this cause it is sufficient to hold that plaintiff failed to establish a significant probability of causation between defective product and enhanced injuries, hence the burden of proof did not shift, hence the trial jury was properly instructed.

2. ■ Plaintiff assigns as error the court's refusal to instruct the jury on a negligence per se theory based on the allegation that the seat belt did not meet safety standards prescribed by California Vehicle Code section 27300 in effect at the time of the sale of the vehicle. (The requested instruction is set out, above, at fn. 1.) Such an instruction was unwarranted in that plaintiff failed to offer any evidence that the design of the seat belt violated the statute. The statute did not specify physical

---

[3] The transcript exhibits many examples of poor reasoning and bad judgment on the part of plaintiff's expert witnesses. As one example we note that one engineer hypothesized that the strain energy on the belt caused it spontaneously to develop a temperature of 400 degrees Farenheit. whereby the "signature" occurred. As pointed out by other experts such a hypothesis is arrant nonsense. and there was no experimental evidence to support it.

engineering standards.[4] Rather it provided in general terms that a seat belt or harness must "prevent or materially reduce the movement of the person using the same in the event of collision or upset of the vehicle." In this lengthy record there is no testimony that plaintiff's belt did not materially reduce his movement before it ruptured, and the fact that he was not thrown from his vehicle supports an inference that the belt reduced his movement to some degree. No technical evidence was produced to show any violation of the more detailed engineering safety standards referred to in footnote 4; for, as previously noted, not enough of the belt had been preserved to make such evidence possible. Thus, unlike the situation in *Haft*, substantial evidence of any statutory violation is lacking.

We note that plaintiff's requested instruction No. 5 (*ante,* fn. 1) attempted to invoke the doctrine of negligence per se by reason of the alleged statutory violation of the Vehicle Code. This cause was neither pleaded nor tried as a negligence action, and the issue of defendants' negligence by reason of violation of a statute was not raised. To have permitted plaintiff to shift to a negligence theory between close of trial and submission to jury would have been prejudicial to defendants, because, unlike the situation in a product liability cause, plaintiff's contributory negligence would have been a defense to a charge of negligence per se in the pre-*Li* days (*Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756, 770 [91 Cal.Rptr. 745, 478 P.2d 465]; *Smith* v. *Americania Motor Lodge* (1974) 39 Cal.App.3d 1, 9 [113 Cal.Rptr. 771]), and, presumably, still remains a defense under the comparative negligence doctrine of *Li* (*Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 53 P.2d 1226, 78 A.L.R.3d 393]).[5]

---

[4] Vehicle Code section 27301 in effect at the time of the sale of plaintiff's automobile delegated to the Highway Patrol responsibility for promulgating engineering safety standards for seat belts, within limits set by the Civil Aeronautics Administration. The regulations issued under the statute incorporated by reference Federal Motor Vehicle Safety Standard No. 209. (For regulations in effect at the time of sale of plaintiff's automobile, see Cal. Admin., tit. 13, §§ 990-992 (Register 67, No. 44, Nov. 4, 1967); and 31 Fed. Reg. 11528-11540 (Aug. 31, 1966) setting out the text of Safety Standard No. 209.) The present text of Federal Motor Vehicle Safety Standard 209 is found at 49 C.F.R. section 571.209. In 1968 the provisions of former Vehicle Code section 27300 et seq. were transferred to section 2402.5 of the Vehicle Code (Stats. 1968, ch. 980, p. 1874).

[5] *Li* applies to trials begun after 31 March 1975. The trial in this cause began on 11 August 1975, and accordingly *Li* does apply. Because we do not reach the issue of plaintiff's contributory negligence, we need not discuss the unresolved question of the application of *Li* in the context of a product liability case. (See *Horn* v. *General Motors Corp.* (1976) 17 Cal.3d 359, 373 [131 Cal.Rptr. 78, 551 P.2d 398], dissent by Clark, J.; and *Buccery* v. *General Motors Corp.* (1976) 60 Cal.App.3d 533, 549 [132 Cal.Rptr. 605] (dicta), for the two opposing viewpoints.)

3. Because we do not believe that plaintiff established as a matter of law that his seat belt was defective and that this defect enhanced his injuries, we do not discuss his remaining contentions in detail. We point out, however, that none of them constitutes error. ■ Plaintiff's claim that the court must instruct the jury that contributory negligence is no defense to a product liability action may be correct when plaintiff's negligence and assumption of risk are pleaded and vigorously argued to the jury (*McGoldrick* v. *Porter Cable Tools* (1973) 34 Cal.App.3d 885 [110 Cal.Rptr. 481]), but here no issue was made of plaintiff's negligence. Plaintiff's real complaint is that the facts of the accident speak for themselves and tend to pinpoint plaintiff's driving as the effective, efficient cause of his misfortune.

4. ■ Similarly, the nonsuit in favor of Installer was correct. ■ In ruling on a nonsuit a court must disregard conflicting evidence, give plaintiff's evidence all the value to which it is legally entitled, and indulge plaintiff in every legitimate inference that may be drawn from his evidence. (*Balido* v. *Improved Machinery, Inc.* (1972) 29 Cal.App.3d 633, 637 [105 Cal.Rptr. 890].) ■ In applying this rule, we find no evidence that Installer was an integral part of the overall marketing enterprise that produces Datsun automobiles or that it played any significant role in placing Datsun's product in the stream of commerce that could render Installer liable in tort for defects in Datsun's automobiles. (*Price* v. *Shell Oil* (1970) 2 Cal.3d 245, 252 [85 Cal.Rptr. 178, 466 P.2d 722].) As a mere provider of services Installer is not liable for defects in the product. (*Shepard* v. *Alexian Bros. Hosp.* (1973) 33 Cal.App.3d 606, 609, 612 [109 Cal.Rptr. 132].) Nor is there anything in this record to indicate that Installer should have recognized the possibilities of misadventure that might arise from proximity of seat belt and metal L-bracket. The trial court correctly rejected as untimely and prejudicial an amendment of plaintiff's cause of action at the close of plaintiff's case that sought to plead a negligence count against Installer.

5. ■ The criteria for admission of the crash test film require that its data be relevant; that its test be conducted under conditions substantially similar to those of the actual occurrence; that its presentation not consume undue amounts of time, not confuse the issues, and not mislead the jury. (*Culpepper* v. *Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 521 [109 Cal.Rptr. 110].) In this area the exercise of discretion by the trial court is controlling except when clearly erroneous. (*Culpepper, supra,* at p. 522.) Here, although the circumstances of the test were not precisely identical with those of the actual occurrence, a close

approximation of the head-on impact and the maximum force brought to bear on the seat belt was reached. The test was highly relevant as tending to show that the seat belt, if not abused, did not rupture under the force of the impact that actually occurred. The film was not particularly time consuming, and we do not see how it could have confused the jury. What plaintiff attacks as prejudicial suggestion is in fact probative evidence; namely, the movements of the dummies' upper torsos during head-on impact, movements that tended to show the probability of bodily injury even when seat belts do not rupture.

The judgments in favor of the defendants are affirmed.

Compton, J., and Beach, J., concurred.

A petition for a rehearing was denied October 28, 1977, and appellant's petition for a hearing by the Supreme Court was denied November 30, 1977.