[No. C002199. Third Dist. Nov. 27, 1990.]

GARY D. DOUPNIK, JR., et al., Plaintiffs and Appellants, v. GENERAL MOTORS CORPORATION, Defendant and Appellant.

[Opinion certified for partial publication.*]

_____

*The Reporter of Decisions is directed to publish the opinion except parts V through VIII of the Discussion.

852

## Counsel

Porter, Scott, Weiberg & Delehant, Anthony S. Warburg and Norman V. Prior for Plaintiffs and Appellants.

Weintraub, Genshlea, Hardy, Erich & Brown, David S. Worthington, Grace, Neumeyer & Otto, Grace & Neumeyer, Neumeyer & Boyd, Richard A. Neumeyer, Carol Boyd, Douglas E. Brown and Christine M. Weinert for Defendant and Appellant.

## Opinion

**BLEASE, Acting P. J.**—Defendant General Motors Corporation (General Motors) challenges a jury verdict which found that a defect in the welds of a roof pillar of a car it manufactured was a legal cause of its collapse in an accident, rendering plaintiff Gary Doupnik a quadriplegic (causing thereby a loss of consortium to his wife, plaintiff Sally Doupnik).

The accident occurred when Gary Doupnik, while intoxicated, lost control of his Oldsmobile; it left the road and plunged down a rocky embankment and overturned, coming to rest on its roof. The driver's side of the roof collapsed from the forces imposed on the defective welds, forcing Doupnik's head backward over the top of the seat, tearing ligaments in his neck, releasing vertebrae which allowed them to crush his spinal cord, resulting in quadriplegia.

The jury was directed that Doupnik was negligent and that his negligence was a legal cause of the accident and his injury. On the remaining issues the jury returned special verdicts. It found General Motors liable for the injury and that Gary Doupnik suffered damages in the sum of $6,668,212. It apportioned 80 percent of the fault to him. It found plaintiff Sally Doupnik's damages for loss of consortium to be $1.6 million. The trial court reduced Sally's award to $1 million. Both sides appeal.

General Motors does not challenge the finding that the roof pillar welds were defectively manufactured. Instead, it advances three other contentions on appeal which we consider in the published portion of this opinion.[1] It claims the jury was not tendered the question whether Doupnik would have broken his neck notwithstanding the defective welds because the roof would have collapsed in any event given the magnitude of the forces unleashed by

---

[1] See footnote, *ante*, page 849.

the accident. It claims that there is no substantial evidence to uphold the finding the defect was a legal cause of the injury. It claims the plaintiffs failed to rule out the hypothetical possibility that Doupnik might have broken his neck in any number of ways other than that posed by the evidence. We will conclude that the jury was properly instructed on legal cause, that there is substantial evidence in support of the jury finding on that issue, and that the plaintiffs did not have the burden of ruling out hypothetical alternative causes of Gary Doupnik's injury.

General Motors also contends that if the judgment is allowed to stand, it is only responsible for 20 percent of Sally's award. In their cross appeal, plaintiffs contend that the trial court erred in directing a verdict against Gary on the issue of his comparative fault and improperly reduced Sally's award. In the unpublished portion of this opinion we conclude that only the latter contention is meritorious.

### Facts Relating to Causation

On January 8, 1983, James Gillespie and Gary Doupnik (Doupnik hereafter) attended a wedding reception. Both men drank bourbon and 7-up. About 10 p.m., after four hours or so at the reception, they left together in Doupnik's car. Doupnik assured Gillespie that he was "okay to drive." They proceeded down Auburn-Folsom Boulevard toward Folsom.

The car approached a curve in the road traveling about 45 miles per hour. As it entered the curve Gillespie noted that the car drifted to the right toward a "paddle" marking the roadway boundary. Gillespie called out "Gary." The car struck the marker, lost its grip on the road, and left the roadway. Gillespie heard a lot of bumps, crashes, and bangs before losing consciousness. When he awoke the car was upside down. He got out and went around to the driver's side of the car. The roof had collapsed down toward the top of the driver's seat. Doupnik was upside down with his neck "at a bad angle," his head was "way back," pushed up against the roof.

Plaintiffs adduced testimony from David Blaisdell, an engineer specializing in the analysis of vehicle accidents and their reconstruction. He visited the scene and studied photographs of the scene of the accident, depositions of witnesses, and the car. The car traveled 174 feet after leaving the road. At the point of the bent paddle marker where it left the road it was traveling between 38 and 50 miles per hour. It traveled down an embankment, striking rocks at the bottom. This impact slowed the car and caused severe damage to the floor of the car behind the driver's seat. The car continued onward, careened onto the passenger side and rolled over. When the driver's side of the roof struck the ground, the force broke the driver's side

window. At this point the car was traveling between 20 and 24 miles per hour. It then slid on its roof, at a speed of five miles per hour, thirty feet further into a utility pole where it came to rest.

From the pattern of scratches, dents, and buckling in the surfaces of the car Blaisdell reasoned that the collapse of the roof was progressive and that a lot of deformation occurred after the driver's side of the roof impacted the ground. In his opinion, from the damage on the passenger side to the roof and scratches on the passenger side A-pillar (the pillar between the windshield and the door), the car first rolled over onto the passenger side of the roof rather than flipping into the air and landing on the driver's side of the roof. In view of the speed of the car at the time it rolled over and the failure to continue to roll Blaisdell opined that this was in the low end of the range of severity of impact.

Plaintiffs also adduced testimony from John Marcosky, a mechanical engineer, who was retained to determine if there was anything wrong with the vehicle that contributed to the accident. He observed separations of metals at the base of the A-pillar on the driver side of the car. The pillar is fabricated from overlapping sheets of metal which are welded to the roof and body of the car. From the condition of the metal at the base of the A-pillar Marcosky opined that several welds at that point provided insufficient support because the metals had not been properly welded.

In Marcosky's opinion the defective welds caused the A-pillar to collapse. Some of the metal sheets in the pillar were permitted to move downward reducing the strength of the pillar and allowing it to bend backwards. In Marcosky's opinion if the welds had not been defective the roof would not have collapsed and invaded the occupant space. He detailed his reasons as follows. The point at which the A-pillar failed because of the defective welds is ordinarily two and a half times stronger than the weakest point in a properly manufactured pillar. Marcosky characterized the roll of the car as a threshold roll based on evidence that the passenger side of the roof struck the ground first and that the car went through only one and one-half rolls. In such a roll the center of gravity of the car does not drop far and the circular velocity is low. In such a rollover, if this car had good welds, the roof would not have collapsed.

Marcosky conceded on cross-examination that a deformation of the bottom of the car caused Doupnik's seat to move upward two and one-half inches towards the roof. He further conceded that even with good welds there would be some deformation in the roof, that more than likely it would occur in the sheet metal on the top of the roof and it would require testing to determine the extent of such ordinary deformation. He asserted that

some deformation was desirable to absorb some of the energy of impact but maintained that with a drop in center of gravity of up to two feet, a properly manufactured car would not deform sufficiently to encroach on the occupant space. He conceded that he had not attempted to quantify the amount of force that had actually been applied to the roof in this accident or the amount of additional strength that would have been provided if the welds had been properly accomplished.

Plaintiffs adduced the following testimony from Victor Frankel, a practicing orthopedic surgeon with a doctorate in orthopedic biomechanics. He was retained to determine how the injury to Doupnik's neck had occurred. In his opinion, Doupnik "had a hyperextension injury of the neck, which caused tearing of the ligaments holding the front part of the 5th cervical and 6th cervical vertebrae together, allowing those bones to spring apart, striking and crushing, contusing the spinal cord . . . ." The injury occurred when "the front pillar bent down and the roof sloped in on him, [destroying] any space he had for maintaining his position. His head was forced back over the back of the seat, and he was trapped back there by the incoming roof, and the back of the seat. That forced his neck to go all the way back, and then a little more force of the roof caused a little more motion and that ripped the ligaments."

This is an unusual type of injury. A more frequent injury occurs where the head is forward or, if it is back, where the injury is caused by the force of a sudden impact. In such a case the neck bones are crushed or broken even if the ligaments rupture. There is no evidence of that in this case. In Frankel's opinion the injury that Doupnik sustained in this accident would not have occurred "if that roof had not intruded down into that occupant's space."

On cross-examination Frankel was asked the following question: "you can't tell us whether or not one inch or two inches or three inches of roof crush would have caused the same injury, can you?" He answered: "This injury was brought about by the roof crushing sufficiently to trap his head back there. So whether it was one inch, two inches, three inches, doesn't make any difference. [¶] There was enough roof crush to force his head into hyperextension, continue forcing it back until it ruptured." When the same question was reiterated, Frankel said: "As long as the roof came down far enough to force his head back and to trap it back there, continue the motion, there was enough. I can't put whether it was an inch, a quarter inch an eighth or whatnot, there was enough deformation of that roof to do the damage."

*Discussion*

I

*Introduction*

General Motors challenges the adequacy of the instructions on legal cause and the substantiality of the evidence on that issue. The common thread uniting the issues posed by General Motors has to do with the relative contributions of successive wrongs, Doupnik's driving off the road and General Motors's defective welds, to the injury he suffered. With respect to products liability the issue is one of comparative fault. (See *Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725 [144 Cal.Rptr. 380, 575 P.2d 1162].) With respect to causation the issue is one of concurrent cause. Given that the jury was directed that Doupnik's wrongful conduct was a legal cause of his injury the remaining question is whether the defective welds were also a legal cause of the injury.

General Motors seeks in various ways to prize off the causal role of the defective welds from the causal role of the negligent driving in the production of Doupnik's injury. It claims that the jury was not instructed and the plaintiffs failed to prove that the defective welds enhanced his injury, i.e., that Doupnik would have broken his neck notwithstanding the defective welds because the roof would have collapsed in any event given the magnitude of the forces unleashed by the accident. It claims the plaintiffs failed to rule out the possibility that Doupnik might have broken his neck in any number of ways other than that posed by the evidence. As we show, the first claim was correctly resolved by the instructions; as to the second claim, there is no evidence which would support the speculation implicit in it, and plaintiffs did not have the burden of ruling out theories of causation not posed by the evidence.

In cases of complex physical causation the multiplicity of causes and injuries may present difficult questions of attribution. "[I]t may be uncertain what part of injuries actually suffered would have been suffered in the absence of one contributing factor." (Hart & Honore, Causation in the Law (2d ed. 1985) (hereafter Hart & Honore) pp. 226-227.)

"The difficult cases are those in which the evidence is obscure or the harm to be attributed to different factors has intensive magnitude." (Hart & Honore, *supra*, at p. 226, fn. omitted.) Nonetheless, "it is in this type of case that the terminology of 'substantial' or 'material' factor has its most literal application." (*Ibid.*) Where the jury, as here, is instructed in the language of substantial factor "[t]hese are problems of evidence." (*Id.* at p. 227.) In this

case we have a singular or indivisible injury, Doupnik's quadriplegia. Thus the question of legal cause is whether the defective welds were a necessary condition of that injury. As we later show, there is substantial evidence in support of the jury's finding that the defective welds were a legal cause of, i.e., a substantial factor in the production of, Doupnik's injury.

General Motors implicitly analogizes this case to one involving an accident so violent as to render it impossible to isolate the role of the manufacturer's defect from the role of the accident in the production of the injury. This might be the case if all that was shown was that Doupnik drove his car over an embankment, it landed on its roof and the roof collapsed from the force of the fall. (Cf. *Endicott* v. *Nissan Motor Corp.* (1977) 73 Cal.App.3d 917, 926-927 [141 Cal.Rptr. 95, 9 A.L.R.4th 481].) The analogy fails for the reason that plaintiffs adduced detailed evidence showing the physical mechanism by which the defective welds caused Doupnik's quadriplegia. The evidence shows that the roof collapsed by reason of the defect when the Doupnik car rolled over at the point at which much of its momentum had been dissipated, forcing Doupnik's head over the top of the seat and crushing his spinal cord.

Before considering the substantiality of the evidence which bears upon this theory of causation we examine General Motors's challenge to the instructions on legal cause, prefacing that examination with a review of the role of legal cause in the determination of the liability of a manufacturer of an automobile for injury occurring in an accident involving its vehicle.

II

*Causation and Liability*

This case involves the "crashworthiness" of the Doupnik vehicle. The term came into vogue in the argument that a vehicle manufacturer should not be liable under a products liability theory for injury occurring in the crash of an automobile where the *accident* was not caused *by* the defect itself (e.g., a defect in the brakes), because an accident is not a normal or intended use of the product.

The argument has been rejected.  ■  "Although a collision may not be the 'normal' or intended use of a motor vehicle, vehicle manufacturers must take accidents into consideration as reasonably foreseeable occurrences involving their products. [Citations.] The design and manufacture of products should not be carried out in an industrial vacuum but with recognition of the realities of their everyday use." (*Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 126 [104 Cal.Rptr. 433, 501 P.2d 1153].) For that reason "[t]he

manufacturer must evaluate the crashworthiness of his product and take such steps as may be reasonable and practicable to forestall particular crash injuries and mitigate the seriousness of others." (*Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1, 7 [116 Cal.Rptr. 575].) To this extent an automobile manufacturer has a legal duty to design and manufacture its vehicles to provide for the safety of the occupants *in* a vehicular accident.

■ In a products liability case involving a motor vehicle, as in other products liability cases, the protective ends of the law are "attained by the necessity of proving that there was a defect in the manufacture or design of the product and that such defect was a proximate [or legal] cause of the injuries." (*Cronin* v. *J.B.E. Olson Corp., supra*, 8 Cal.3d at p. 133.) That follows from the general principle of tort law that " '[t]he causal relation must be shown to exist between that aspect of a defendant's conduct which is wrongful and the injury.' " (Hart & Honore, at p. 118, fn. omitted.) The wrongfulness of the conduct must relate to the injury in the sense that the injury must be of the kind to which the proscription of the wrongful conduct is directed. "[V]ery often consideration of the purpose of a legal rule will show that certain kinds of harm alleged to have been caused by a breach of the rule are altogether outside its scope, since it is obvious that the rule is not concerned to give protection against that sort of harm." (*Id.* at p. 109.) As noted, with respect to crashworthiness cases, a manufacturer must design and construct its vehicle "as may be reasonable and practicable to forestall particular crash injuries . . . ." (*Self* v. *General Motors Corp., supra*, 42 Cal.App.3d at p. 7.) In this case there can be no dispute that the proper manufacture of the car roof supports in the General Motors car bears directly upon the protection of its occupants from injury which might occur from the collapse of the roof by reason of defective manufacture.

For these reasons the jury was properly instructed in the language of BAJI No. 9.00.3. "The manufacturer of a product is liable for injuries a [legal] cause of which was a defect in its manufacture which existed when it left possession of defendants, provided that the injury resulted from a use of the product that was reasonably foreseeable by the defendant[s]. [¶] A defect in the manufacture of a product exists if the product differs from the manufacturer's intended result or if the product differs from apparently identical products from the same manufacturer." This measure of liability, as the instruction provides, requires that the defect be a "legal cause" of the injuries suffered.

We turn to that issue.

## III

### *The Instructions on Legal Cause*

The jury was instructed that "[a] legal cause of damage is a cause which is a substantial factor in bringing about the damage." (BAJI No. 3.76.) General Motors does not challenge this instruction. ██ Rather, it argues that the trial court erred in failing to give, in its entirety, a requested supplemental instruction which it claims would have "instructed [the jury] on the crucial issue in the case: the degree to which the alleged defect, rather than the severity of the accident itself, caused the quadriplegia."

The requested instruction reads in its entirety: "[1] If you find that the [Doupnik car] was defectively manufactured, but that the same or similar deformation of the roof would have occurred even if the vehicle was not defective, then the defective vehicle was not a [legal] cause of the plaintiff's injuries. [¶] [2] If you find that the [Doupnik car] was defectively manufactured, but that the accident severity was such that the plaintiff would have sustained similar injuries absent any defect, then the defective vehicle was not a contributing cause of the plaintiff's injuries." The trial court gave the first part of this instruction and rejected the second part.

General Motors argues that both parts [1] and [2] of the proposed instruction were essential to put in play its theory of the defense "that if the same or similar injury would have occurred absent a defect, defendant was not liable." We disagree.

As we will show, the jury was properly instructed on legal cause in the language of the substantial factor test; part [1], as given, amplified that test; those two instructions conveyed General Motors's only tenable theory on legal cause; and part [2], which was rejected, finds no support in the evidence.

### A.

### *The Substantial Factor Test of Legal Cause*

At issue is whether the defective welds were a necessary condition, or cause in fact, of the (indivisible) injury to Doupnik.

The jury was instructed that the plaintiffs have the burden of proving that the defective welds were a legal cause of Doupnik's injury. As noted, the jury was also instructed that "[a] legal cause of damage is a cause which is a substantial factor in bringing about the damage." (BAJI No. 3.76.) This test

subsumes the "but for" test of cause in fact, that "[a]n act or an omission is not regarded as a cause of an event if the particular event would have occurred without it." (Prosser & Keeton on Torts (5th ed. 1984) § 41, p. 265.)

The substantial factor test directs the attention of the trier of fact to the contribution which culpable conduct, among other causal factors, makes to the injury for which recompense is sought. If the conduct which is claimed to have caused the injury had nothing at all to do with the injuries, it could not be said that the conduct was a factor, let alone a substantial factor, in the production of the injuries. That is, it could not be said that "but for" the wrongful conduct the injuries would not have occurred. That is the view of the Restatement Second of Torts, from which BAJI No. 3.76 is derived (See com. to BAJI No. 3.76). The negligent conduct of the actor is "not a substantial factor in bringing about harm . . . if the harm would have been sustained even if the actor had not been negligent." (Rest.2d Torts, § 432(1).)

For these reasons Prosser tells us that, with a unique exception not at issue, the substantial factor test "produces the same legal conclusion as the but-for test [though not conversely]. Except [as noted], no case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it; nor will cases very often arise where it would not be such a factor when it was so indispensable a cause that without it the result would not have followed." (Prosser & Keeton, *supra*, § 41, p. 268, fns. omitted.)

Consistent with this view, counsel for General Motors explained to the jury that "essentially what [the substantial factor test] means is that if it wasn't for a defect, would the injury have occurred. [¶] . . . Plaintiffs have the burden of showing that absent this defect and absent that roof deformation that there wouldn't have been an injury, and Mr. Doupnik would have walked away." We will conclude that since the instructions given on plaintiff's burden of proof and legal cause were legally correct and encompassed the defendant's theory of the case it was not error to reject part [2] of General Motors's instruction.

General Motors claims the instructions were inadequate because they did not address the questions (1) whether Doupnik's injuries were enhanced by the defect in the welds and (2) whether plaintiffs had the burden of ruling out the accident, as opposed to the defect, as the "superseding cause" of the injury. It relies on two California cases.

In *Endicott* v. *Nissan Motor Corp., supra*, 73 Cal.App.3d at page 927, the issue was whether the plaintiff, injured in an automobile accident in which a

seat belt ruptured, could rely on a presumption that the rupture aggravated his injury and thereby shift the burden to the defendant to negative that possibility as a legal cause of the injury. The court rejected the argument, saying that plaintiff had the burden of proving that the rupture of a seat belt in an automobile accident "enhanced" his injury. (*Id.* at p. 926.) The plaintiff could not carry that burden because he could not show at the threshold that the seat belt was defective.

*Endicott* follows the general rule that an automobile manufacturer is liable for a defective design in its product that results in personal injury. With respect to legal cause it said: "Although a defect need not be the cause of a motor vehicle accident in order to allow plaintiff to recover for injuries resulting from that defect [*Cronin, supra*], and although motor vehicle accidents are foreseeable hazards whose possibility an automobile manufacturer must keep in mind when designing vehicles (*Self* v. *General Motors Corp., supra*, 42 Cal.App.3d 1) it is a necessary prerequisite to recovery for defective design that the *defect be a substantial contributing factor* to plaintiff's injuries (*Cronin,* v. *J.B.E. Olson Corp., supra*, 8 Cal.3d at p. 127). If the violence of a crash is the effective efficient cause of plaintiff's injuries to the extent that it supersedes other factors such as defective design and makes them immaterial, plaintiff cannot recover." (*Endicott* v. *Nissan Motor Corp., supra,* 73 Cal.App.3d at p. 926, italics added.)

While using the terminology of "enhanced" injury and "superseding" factor, the court employs these terms within the context of the substantial factor test. The opinion says no more than if, given the forces put in play by the accident, the plaintiff would have suffered the injury notwithstanding the claimed defect, it cannot be said that the defect was a substantial contributing factor to the injury. Thus *Endicott* does not impugn the adequacy of the substantial factor test to put in issue the theory advanced by General Motors.

Nor does *Self* v. *General Motors Corp., supra*, upon which General Motors also relies. In that case it was argued that the claimed defective location of a gas tank in a parked General Motors car, which caught fire when hit by another car, was a substantial factor in the production of the injury suffered by the plaintiff. The jury was apparently instructed on the substantial factor test of causation. However, the court said that the trial court "prejudicially erred in refusing to give the following specific instruction on superseding cause requested by General Motors: 'If you find that the gasoline tank in the [car] was improperly located, but that the fire would have occurred even if the tank had been properly located, its location was not a substantial factor in bringing about the fire and was, therefore, not a contributing cause thereof.'" (42 Cal.App.3d at p. 10.) *Self* reasoned that the requested

instruction"would have brought into focus for the jury the critical issue of superseding cause . . . ." (*Id.* at p. 10.)

The use of the terms "superseding" or "superseding cause" in these opinions should not be confused with the doctrine of superseding cause which relieves an actor of liability notwithstanding that the actor was a cause in fact of the injury for which recompense was sought. "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." (Rest.2d Torts, § 440.) ■ In California the doctrine requires more than mere negligence on the part of the intervening actor. "[T]he fact that an intervening act of a third person is done in a negligent manner does not make it a superseding cause if a reasonable man knowing the situation existing when the act of the third person is done would not regard it as highly extraordinary that the third person so acted or the act is a normal response to a situation created by the defendant's conduct and the manner in which the intervening act is done is not extraordinarily negligent." (*Stewart* v. *Cox* (1961) 55 Cal.2d 857, 863-864 [13 Cal.Rptr. 521, 362 P.2d 345].) General Motors does not tender this theory of shifted responsibility as a defense to liability.

As shown, *Self* and *Endicott* employ the terms "superseding cause" or superseding factor to address the "but for" aspect of the substantial factor test. That standard of cause was adequately conveyed in this case by the substantial factor instruction amplified by part [1] of General Motors's supplemental instruction. "If you find that the [Doupnik car] was defectively manufactured, but that the same or similar deformation of the roof would have occurred even if the vehicle was not defective, then the defective vehicle was not a [legal] cause of the plaintiff's injuries."

■ General Motors nonetheless argues that it was also necessary to give the rejected part [2] of its requested instruction. It claims there are two ways by which Doupnik's injury would not have been legally caused by the defective welds. The first is that the injury would have occurred regardless of the defective welds because the collapse of the roof was inevitable given the forces unleashed by the accident. For the reasons previously advanced, this theory was covered by the instructions.

General Motors alternatively claims that Doupnik might have broken his neck in any number of ways other than by hyperextension, the means of injury which actually occurred. It claims that this theory of (alternative) causation was addressed by the rejected part [2] of the requested instruction. "If you find that the [Doupnik car] was defectively manufactured, but

that the accident severity was such that the plaintiff would have sustained similar injuries absent any defect, then the defective vehicle was not a contributing cause of the plaintiff's injuries." The argument is that Doupnik would have suffered the same or a similar injury whether or not the roof collapsed, as (say) by hitting his head against a *non*deformed roof.

Preliminarily, we note that General Motors misperceives the plaintiffs' burden of proof. ■ General Motors argues that the plaintiffs did not prove that the injury was not inevitable because they did not "rule out" the possibility the roof would have collapsed even had the A-pillar been flawlessly welded. Plaintiffs were not required to rule out all possible alternatives to the causal mechanism shown by the evidence. They were only required to show that this mechanism was more probable than not the cause in fact of Doupnik's injuries, i.e., "but for" the mechanism of causation shown by the evidence Doupnik would not have suffered quadriplegia. As shown in part IV of this opinion, plaintiffs' evidence was adequate for this purpose.

Setting that aside, the alternative causation argument fails at the threshold. ■ "[A] party has a *right* to instructions on his theory of the case, if it is reasonable and finds support in the pleadings and evidence or any inference which may be properly drawn from the evidence." (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 240, p. 246, original italics.) However, it is not error to decline to give a requested instruction if the instructions given adequately cover the issues in the case. (See e.g., *Moreno* v. *Fey Manufacturing Corp.* (1983) 149 Cal.App.3d 23, 28 [196 Cal.Rptr. 487]; 7 Witkin, Cal. Procedure, *supra*, Trial, §§ 240-243, pp. 246-250.) Here, there is *no* evidence which would have permitted an inference that, whether or not the roof collapsed, Doupnik would have broken his neck in the accident.

The evidence to which General Motors points is the testimony of its witness Edward Moffatt, an engineer who specializes in biomechanics. It relies upon a snippet of his testimony in which he asserts that Doupnik could have received the same injury if the roof had not sustained any substantial deformation. However, Moffatt amplified this assertion as follows. An injury often called diving injury can occur when a person's head hits something and the body keeps moving relative to the head. In an accident like this one if the roof stops when it hits the ground and the person continues and moves into the roof there is plenty of force to break a neck with no deformation whatsoever. He noted: "There is a lot of randomness to this. In that you have to have your head lined up right. . . .

"

"So there is a lot of plain bad luck in getting your body aligned in that unfortunate position." Moffatt conceded on cross-examination that in this accident the injury "most likely was sustained very close to the end of the accident, near the point of rest." In his view it occurred after the impact of the roof, "at the end of the slide." Moffatt concluded that the injury Doupnik did receive was in fact caused by the roof collapse.

■■■ When read in the context of all of his testimony, Moffatt's assertion that Doupnik could have sustained the same injury without any substantial deformation of the roof is a hypothetical assertion that has no application to the actual accident. We know, for example, that Doupnik did not suffer from a "diving" injury, an injury caused by the impact of his head against the roof, *prior* to the time the deformed roof caused his neck to hyperextend. Nor is there anything in Moffatt's testimony or the evidence about the events which suggests that such an injury might have occurred *after the point* when, in his view, the actual injury occurred. The testimony does not afford the critical inference, that it is more likely than not that had Doupnik not suffered the hyperextension injury he would nonetheless have received a similar injury. Accordingly, the omitted portion of General Motors's instruction was properly rejected.

### B.

### Concurrent Cause

General Motors argues that the trial court erred in giving the BAJI No. 3.77 instruction on concurrent causation.[2]

■■■ It presents an abstract discussion of the unsuitability of the legal term of art "concurrent cause" in a case involving crashworthiness. It says: such an "instruction in a crashworthiness case is a contradiction in terms because the manufacturer can only be held liable for those injuries caused by a defect in the product." The reasoning is incorrect. The doctrine of comparative fault is applicable to crashworthiness cases. (See *Daly* v. *General Motors Corp., supra.*) That is how the case was presented to the jury.[3]

---

[2] The instruction given reads "[T]here may be more than one [legal] cause of an injury. When negligent conduct of two or more persons or entities contributes concurrently as [legal] causes of an injury, the conduct of each of said persons or entities is a [legal] cause of the injury, regardless of the extent to which each contributes to the injury. A cause is concurrent if it was operative at the moment of injury and acted with another cause to produce the injury." (BAJI No. 3.77.) As respondents note, whatever criticism may be directed at the remainder of the instruction, the first sentence is applicable since the jury was instructed that Doupnik's conduct was a legal cause of the injury.

[3] In this case the jury was not instructed in the language of comparative fault, BAJI No. 9.03, but in the language of comparative negligence, BAJI No. 14.91. However, no challenge

Fault is in turn dependent upon legal cause. For there to be comparative fault there must be more than one contributory or concurrent legal cause of the injury for which recompense is sought.

Cases of concurrent cause "fall into three groups: in the first both wrongful acts are necessary conditions of the harm. In the second, one act is not a necessary condition of the harm since there is some other independent wrongful act sufficient to produce the harm (additional causation). In the third, even if defendant had complied with the law, either this or another event, which would then have happened, would have produced similar harm (alternative causation). The first group may be termed cases of contributory causation, since here each wrongful act may be said to have contributed to the harm. Of this the main examples occur in the law of joint and concurrent tortfeasors and contributory negligence." (Hart & Honore, at p. 205, fns. omitted.)

This is a case of the first group, adjusting the doctrine of contributory negligence to that of comparative fault, as required by *Daly* v. *General Motors Corp., supra*. At issue was whether Doupnik's negligence in driving off the road released forces sufficient to cause *only* a *defectively* welded roof pillar to collapse, forcing his head over the top of the seat, crushing his vertebrae and thereby causing quadriplegia. The jury was directed to consider whether each wrong was a necessary condition of that harm. In the language of the concurrent cause instruction (BAJI No. 3.77), quoted with apparent approval in the *Self* case (42 Cal.App.3d at p. 10, fn. 2), the jury was directed to determine whether the defective roof pillar was a concurrent cause of Doupnik's injuries because it was "operative at the moment of the injury and acted with another cause," the forces unleashed by the accident, to collapse the roof.

General Motors suggests that the phrase in BAJI No. 3.77, that where the negligent conduct of two or more persons contributes concurrently as legal cause the conduct of each is a legal cause "regardless of the extent to which [it] contributes to the injury," might be read by the jury to preclude it "from examining the first and second collision separately." We see no such possibility.

First, there were no first and second collisions of consequence to liability. It is true that the Doupnik vehicle bounced down the slope after leaving the road, but the injury to Doupnik occurred at the end of the crash, as the vehicle slowed to a halt, rolling over onto its top and impacting the defec-

is made to this discrepancy nor do we conceive how the jury might thereby have been misled, given that it was directed that Doupnik was negligent, was instructed to apportion liability, and did so, assessing 80 percent of the liability for his injury to him.

tive roof pillar. In that sequence of events there was but one collision of legal consequence.

Nor do we see a likelihood that the jury was misled by the challenged phrase in appraising the standard of legal cause. It is clear from the language of the instruction that the quoted phrase has application only *after* the jury finds that General Motors's conduct was a legal cause of the injury. General Motors fails to show how the language of the concurrent cause instruction might have misled the jury to discount the specific instructions on the disputed issue of legal causation. The concurrent cause instruction does not impugn the substantial factor test of legal cause. It instructs the jury that there may be more than one legal cause. That is important for the apportionment of fault.

In any event, the jury was instructed to find that the defect in this case was not a legal cause of the harm if the same or similar deformation of the roof would have occurred without the defect. This specific instruction covered the "vital [causation] issues in terms that relate to the particular case before [the jury]." (*Self* v. *General Motors Corp., supra,* 42 Cal.App.3d at p. 10.) That rules out the possibility that the jury could have concluded that the defect "contributes [so little] to the injury" that, "but for" the defect, Doupnik would not have suffered quadriplegia.

To the extent that General Motors's argument rests on the premise that a latent defect cannot operate as a legal cause of injury in cases of complex causation it is incorrect. The concurrent cause instruction does not distinguish between active and passive legal causes. A legal cause may be a latent condition. That is frequently the case in products liability cases, including crashworthiness cases. When the concurrent cause instruction is read together with the substantial factor instruction, it is made clear that the forces released in the automobile accident must be sufficient only to cause the collapse of a *defective* roof pillar.

We discern nothing in the language of the concurrent cause instruction that might have deflected the jury's consideration of the proper standard of legal cause.

## IV

### *Substantial Evidence*

Doupnik, as a plaintiff pursuing a products liability claim, had the burden of proof that General Motors's conduct was a legal cause of his injury. (See, e.g., *Cronin* v. *J.B.E. Olson Corp., supra,* 8 Cal.3d at pp. 127

and 133-134; Rest.2d Torts, § 430.) To that end he had the burden of producing evidence that the defective welds were a substantial factor in bringing about the injury he suffered. (See Rest.2d Torts, § 431, subd. (a).) For the reasons given, the jury was adequately instructed on this requirement. The remaining question is whether there is substantial evidence in support of the jury's verdict.

■ A judgment must be upheld if there is substantial evidence in its support. The core of the rule—the doctrine of conflicting inferences—is applicable here. "In so far as the evidence is subject to opposing inferences, it must upon a review thereof be regarded in the light most favorable to the support of the judgment." (*Mah See* v. *North American Acc. Ins. Co.* (1923) 190 Cal. 421, 426 [213 P. 42, 26 A.L.R. 123], citations omitted.) The question of conflicting inferences arises with respect to a *material* fact in the case, i.e., a fact critical to the judgment. If conflicting inferences may be drawn regarding a material fact the appellate court is required to draw the inference favorable to the judgment. "Even if this court were of the opinion that that determination was wrong, it would not have the power to substitute its deductions for those of the trial court. For, as has so often been said, when opposing inferences may reasonably be drawn from the facts in a case, the findings of the trial court will not be set aside." (*McIntyre* v. *Doe & Roe* (1954) 125 Cal.App.2d 285, 287 [270 P.2d 21]; see 9 Witkin, Cal. Procedure, *supra*, Appeal, § 288, pp. 300-301.)

■ This brings us to the question whether there was substantial evidence in support of the jury's verdict. Put more precisely the question is whether an inference can be drawn from the evidence that the defective welds were a substantial factor in bringing about the injury to Doupnik.

In answering this question we are informed by the following comment from the Restatement Second of Torts. "The plaintiff is not . . . required to prove his case beyond a reasonable doubt. He is not required to eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise. If, as a matter of ordinary experience, a particular act or omission might be expected to produce a particular result, and if that result has in fact followed, the conclusion may be justified that the causal relation exists. In drawing that conclusion, the triers of fact are permitted to draw upon ordinary human experience as to the probabilities of the case . . . . Such questions are normally for the jury,

and the court may seldom rule on them as matters of law." (Rest.2d Torts, § 433B, com. (b).)

General Motors argues that the evidence is critically deficient because plaintiffs' witnesses failed to analyze the *forces* acting on the A-pillar, rendering their opinions that the collapse of the roof would not have occurred but for the defective welds speculative. That is not the case. The expert opinions given on the mechanism of causation were sufficient to establish the cause.

Plaintiffs' evidence on the question of collapse of the roof, stripped to its essence, is as follows. When the rollover occurred, much of the momentum of the car had been dissipated. The forward speed inferred from these facts was low and the evidence indicated that the car rolled relatively smoothly with minimal elevation of its center of gravity. Ordinary unflawed cars withstand the impacts of such a rollover without collapse of the roof such as occurred to the Doupnik's car. This evidence is sufficient to permit the inference that "but for" the flawed welds the roof would not have collapsed and would not have encroached into the space occupied by the driver to the degree that occurred here.

General Motors claims that the subject of roof collapse is esoteric and *only* amenable to proof by an analysis of the physical forces acting upon the roof, e.g., by means of expert testimony involving a calculation of the forces acting upon the driver's-side roof and the impact of such forces upon the vehicle in its defective condition. We see no reason why the mode of proof must be so constrained. There is a saying that, according to the science of aeronautical engineering, a bumble bee cannot fly. But if that were an issuable fact, the defects in the theory could be shown by the observations of a beekeeper or an entomologist.

It is ordinarily within the competence of an expert in the field of automobile accidents to predicate an opinion about the cause of an injury upon the descriptive characteristics of an accident and to express it in that form. Such a mode of proof is not inherently implausible. (See 9 Witkin, Cal. Procedure, *supra*, Appeal, § 284, pp. 295-296.)

General Motors points to no evidence that compels the contrary conclusion as a matter of law, i.e., that compels the sole inference that the welds were not a cause of the injuries. The jury was permitted to infer from the evidence that the accident involved a relatively low momentum rollover in which a roof collapse would not usually occur and to conclude that more likely than not the reason for the unusual collapse was the defective attachment of the supporting pillar to the body of the car. Since the evidence

submitted by plaintiffs is legally credible and the inferences drawn therefrom support the jury's conclusion, its verdict is supported by substantial evidence.

General Motors nonetheless argues that plaintiffs' witnesses failed to show that the injury would not have happened given the deformation that would have occurred had the roof pillar been flawlessly welded. This argument relies on Frankel's testimony that he could not say precisely how many inches the head had to be pushed back before the neck ligaments snapped and Marcosky's testimony that there would be some deformation of the roof regardless of perfect welds. General Motors argues that these concessions, when coupled, vitiate the conclusion that the injury was attributable to the defective welds since the deformation of a flawlessly welded roof may have been sufficient to snap Doupnik's neck.

However, Marcosky qualified his concession that there would be some deformation without the defective welds with the insistence that it would not have been sufficient to encroach into the zone of protection required by the driver. It is not certain whether his answer presupposed the condition of the car in this accident, i.e., that at the time of the injuries the seat center had been raised two and one-half inches by the force of the accident. (There was evidence that prior to the accident the distance between Doupnik's head and the ceiling was approximately two inches.) However, we must presume in support of the judgment that the answer contained this presupposition, since Marcosky was aware of the predicate facts and since no clarifying question was broached by General Motors.

Frankel's concession was also significantly qualified. He conceded that the point at which the snap would occur was indeterminate. However, that point would only be reached after the head had been placed in a position to hyperextend the neck. His testimony must be viewed, and can only be critically appraised, against the backdrop of evidence of the actual deformation of the roof in this case. Frankel noted "I've seen pictures of how the roof was down and there's no room, and the pictures of the injured person, with his head trapped back there. That was nice to see the car, to really see that there was no room back there. I mean, his head was just pushed back, back, back by this encroaching roof and he finally got pushed back a little bit too much and it snapped."

The trier of fact had the advantage of viewing the photographs and the car itself. The jurors were able to integrate the evidence, inter alia by visualizing their own necks in the various attitudes pertinent to the actual deformation of the roof and the range of lesser deformation that would likely have occurred if the welds were flawless. We are unable to say that

the shortcomings perceived by General Motors would preclude a reasonable trier of fact from concluding that, but for the defective welds, more likely than not the snapping point of Doupnik's neck would not have been reached.

### V-VIII*

. . . . . . . . . . . . . . . . . . . . . . .

### Disposition

The judgment is modified to award Sally Doupnik judgment in the amount of $1.6 million; as modified the judgment is affirmed. Plaintiffs shall recover their costs on appeal.

Sparks, J., and DeCristoforo, J., concurred.

The petition of appellant General Motors Corporation for review by the Supreme Court was denied February 21, 1991. Panelli, J., was of the opinion that the petition should be granted.

---

* See footnote, *ante*, page 849.