Filed 6/29/15  Greenberg v. Superior Court CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| DAVID GREENBERG et al., | B262432 |
| Petitioners, | (Los Angeles County Super. Ct. No. BC555224) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | ORDER MODIFYING OPINION AND DENYING REQUEST FOR PUBLICATION |
| Respondent; | |
| HENNESSY INDUSTRIES, INC. , | [NO CHANGE IN JUDGMENT] |
| Real Party in Interest. | |

THE COURT:*

It is ordered that the opinion filed herein on June 18, 2015 be modified as follows:  On page 20, line 14, change "Sherman's" to "Greenberg's"

Petitioners' request for publication is denied.  The modification does not change the judgment.

_____
*EPSTEIN, P. J.,                    WILLHITE, J.                    MANELLA, J.

Filed 6/18/15  Greenberg v. Super. Ct. CA2/4 (unmodified version)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| DAVID GREENBERG et al., | B262432 |
| Petitioners, | (Los Angeles County Super. Ct. No. BC555224) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| HENNESSY INDUSTRIES, INC. , | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate.  Joseph R. Kalin, Judge.  Petition Granted.

Simon Greenstone Panatier Bartlett and Brian P. Barrow for Petitioners.

No appearance by Respondent.

Gordon & Rees, Don Willenburg and Mitchell B. Malachowski for Real Party in Interest.

Petitioners David and Gloria Greenberg asserted products liability claims against real party in interest Hennessy Industries, Inc. (Hennessy), alleging that a brake lining arcing machine manufactured by its predecessor in interest released asbestos dust that caused David Greenberg's mesothelioma. The trial court granted summary judgment in Hennessy's favor on petitioners' claims, concluding that Hennessy was not liable for injury caused by asbestos dust from brake linings its predecessor in interest neither manufactured nor distributed. Petitioners seek a writ directing the trial court to vacate the grant of summary judgment and to enter a new order denying Hennessy's motion for summary judgment or adjudication. We grant the petition for writ of mandate.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The following facts are not in dispute: From the early 1950's to the 1980's, the Automotive Maintenance Machinery Company (AMMCO) manufactured an "arcing" machine designed to grind drum brake linings for cars and light passenger trucks with standard sized brake shoes. From the early 1950's to the 1980's, the great majority of such drum brake linings contained asbestos. Because the AMMCO machines created dust when used, AMMCO equipped them with a dust collection system to collect dust from the linings being abraded. Asbestos-containing brake linings were so prevalent that in 1973, AMMCO began using a system that it called an "'asbestos dust collector.'"

From 1960 to 1986, David Greenberg worked as a full time auto mechanic in New York City and Los Angeles. In 1967, he established his own business in the San Fernando Valley, and bought a new AMMCO machine equipped with a dust collection system. Until 1986, when the business closed, Greenberg used the AMMCO machine. In June 2014, he was diagnosed as suffering from malignant pleural mesothelioma.

In August 2014, petitioners initiated the underlying action against several defendants, including Hennessy as AMMCO's alleged successor in interest, asserting products liability claims based on negligence and strict liability, as well as claims for conspiracy and loss of consortium. The claims are founded on allegations that the AMMCO machine, when used as intended to grind drum brake linings, released asbestos dust, that Hennessy failed to give adequate warnings regarding that fact, and that the machine's release of asbestos dust -- despite the presence of a dust collection system -- constituted a design defect.

Relying on *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335 (*O'Neil*), Hennessy sought summary adjudication or summary judgment, contending that it had no liability for petitioners' alleged injuries on any theory for a single reason, namely, that it was not legally responsible for injuries attributable solely to products AAMCO neither made nor distributed. Hennessy argued that the AMMCO machine itself contained no asbestos, and that petitioners otherwise could not establish the circumstances necessary for the imposition of liability on a manufacturer for injury from products it neither made nor distributed. Hennessy maintained that under *O'Neil*, no such liability arose unless the AMMCO machine's sole intended purpose was to abrade asbestos-containing brake linings. That condition, Hennessy argued, could not be demonstrated because the AMMCO machine had the capacity to abrade asbestos-free brake linings, which were available in the 1960's and 1970's.

In opposing summary adjudication and summary judgment, petitioners submitted evidence that from the 1950's to the mid-1980's, it would have been "'impossible'" for an average garage worker using the AMMCO machine not to have ground asbestos-containing brake linings. In addition, petitioners offered evidence that the AMMCO machines released asbestos dust despite the presence of

3

dust collection systems, including the asbestos dust collector that AMMCO began offering in 1973.

On February 27, 2015, the trial court granted summary judgment, stating: "The [AMMCO] machine in no way contributed to [petitioners'] harm. [Citations.] The machine was not designed for the purpose of only grinding asbestos[-containing] brake shoes. The dust collection bag was not placed on the machine as a means of protecting users from asbestos. [Citation.]" On March 5, 2015, petitioners filed their petition for writ of mandate. We issued an order to show cause on March 17, 2015.

## DISCUSSION

Petitioners challenge the grant of summary judgment, contending there are triable issues regarding Hennessy's potential liability for their injuries. For the reasons discussed below, we agree.

A. *Relief By Writ*

At the threshold, we address the propriety of our review of the summary judgment. "Immediate writ review of an order granting summary judgment against some but not all of the defendants in a case is appropriate where the trial is proceeding against one or more codefendants. [Citation.] Immediate review is preferable to obviate possible multiple trials in the case. [Citation.]" (*Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 304 (*Johnson*).)

In October 2014, the trial court granted petitioners a preferential trial date of February 17, 2015, following their presentation of expert medical opinion that Greenberg's health was deteriorating due to his mesothelioma, and that there was considerable doubt of his survival beyond six months. In January 2015, at the request of one of Hennessy's co-defendants, the trial date was continued to March

4

2, 2015. Following the grant of summary judgment in Hennessy's favor, the trial court agreed to continue trial to permit petitioners to seek writ review.

Under the circumstances, immediate review of the summary judgment would potentially avoid a second trial against Hennessy in which Greenberg's participation would be doubtful. Furthermore, the issues presented are primarily questions of law, making their resolution by writ review appropriate. (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2004) 114 Cal.App.4th 309, 319.) We therefore exercise our discretion to review the summary judgment. (*Johnson*, *supra*, 143 Cal.App.4th at p. 304.)

### B. *Standard of Review*

"A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.]" (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107.) Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850 (*Aguilar*), fn. & italics omitted.) In moving for summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action -- for example, that the plaintiff cannot prove element X." (*Id*. at p. 853.)

"'Review of a summary judgment motion by an appellate court involves application of the same three-step process required of the trial court. [Citation.]'" (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1662.) The three steps are (1) identifying the issues framed by the complaint, (2) determining

5

whether the moving party has made an adequate showing that negates the opponent's claim, and (3) determining whether the opposing party has raised a triable issue of fact. (*Ibid.*) Following a grant of summary judgment, we review the record de novo for the existence of triable issues, and consider the evidence submitted in connection with the motion, with the exception of evidence to which objections were made and sustained. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.)[1]

### C. *Governing Principles*

In view of the trial court's ruling, the key issue is whether under *O'Neil*, Hennessy can be liable for injuries arising from the application of the AMMCO machine to asbestos-containing brake shoes.

---

[1] Here, our review encompasses the evidence submitted by the parties, with the exception of certain items of evidence submitted to the trial court by petitioners. In connection with Hennessy's motion, both sides raised numerous written evidentiary objections to the showing proffered by their adversary. The trial court overruled petitioners' objections, and overruled in part and sustained in part Hennessy's objections. Because the parties do not challenge those rulings, we disregard the excluded evidence, with the exception of two items of evidence discussed below.

In opposing the writ petition, Hennessy has effectively conceded that we may consider two items of evidence to which Hennessy successfully objected. Generally, material allegations in a petition not denied in the verified answer must be taken as true. (*Baumgardner v. City of Hawthorne* (1951) 104 Cal.App.2d 512, 517.) Here, petitioners allege that in 1973, AMMCO submitted two patent applications regarding a dust collection system, stating that the AMMCO machine potentially created dust constituting a "'definite health hazard,'" and that a serious problem existed "'because of the inherent danger to the persons using this type of equipment.'" Although the trial court's evidentiary rulings excluded the two patent applications, Hennessy's verified answer expressly admits that the applications contain those statements. Our review of the grant of summary judgment thus encompasses the statements.

6

### 1. *Products Liability*

A plaintiff may seek recovery in a "products liability" case either on a theory of strict liability or on a theory of negligence. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 478.) Under either theory, the plaintiff must prove that a defect in the product caused injury. (*Ibid.*) In addition, to establish a negligence theory, a plaintiff must prove that the defect in the product was due to the defendant's negligence. (*Ibid.*) Generally, recovery is permitted for three kinds of defects: manufacturing defects, design defects, and warning defects, that is, inadequate warnings or failures to warn. (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995; *Merrill v. Navegar, Inc.*, *supra*, 26 Cal.4th at p. 749; *Powell v. Standard Brands Paint Co.* (1985) 166 Cal.App.3d 357, 363-364.)

Here, Hennessy sought summary adjudication or summary judgment on petitioners' products liability claims, which sound in strict liability and negligence, and their related claims. The claims are founded on allegations that Hennessy failed to give adequate warnings that the AMMCO machine released asbestos dust, and that the machine's release of asbestos dust despite the presence of a dust collection system reflected a design defect.

Our focus is on strict liability, as *O'Neil* places special emphasis on that type of products liability. The doctrine of strict products liability is traceable to *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 59-60 (*Greenman*), in which the plaintiff asserted claims against a power tool manufacturer based on injuries he suffered as a result of using the tool. In imposing strict liability for the injuries on the manufacturer, our Supreme Court held that "it was sufficient that plaintiff proved that he was injured while using the [tool] in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the [tool] unsafe for its intended use." (*Id.* at p. 64.) "The purpose of such liability," the court explained, "is to insure that the costs of

7

injuries resulting from defective products are borne by the manufacturers that put such products on the market[,] rather than by the injured persons who are powerless to protect themselves." (*Id.* at p. 63.)

In later decisions, the Supreme Court established that under the doctrine, courts ordinarily must look beyond the product's "'normal'" or intended use to its reasonably foreseeable uses. (*Cronin v. J.B.E Olson Corp.* (1972) 8 Cal.3d 121, 126 (*Cronin*); *Horn v. General Motors Corp.* (1976) 17 Cal.3d 359, 366.) "Generally, foreseeability is relevant in a strict liability analysis to determine whether injury is likely from a potential use or misuse of a product." (*O'Neil, supra*, 53 Cal.4th at p. 362.) That determination is appropriate because "[t]he design and manufacture of products should not be carried out in an industrial vacuum[,] but with recognition of the realities of their everyday use." (*Cronin, supra*, 8 Cal.3d at p. 126; accord, *Horn v. General Motors Corp.*, *supra*, 17 Cal.3d at p. 366.)

### 2. *O'Neil*

In *O'Neil*, our Supreme Court examined the extent to which a manufacturer may be liable for injuries arising from "adjacent" products, that is, products made and sold by others, but used in conjunction with the manufacturer's own product. (*O'Neil, supra*, 53 Cal.4th at p. 342.) There, the family of a deceased U.S. Navy seaman asserted claims for negligence and strict liability against manufacturers of pumps and valves used on warships, alleging that the serviceman's exposure to asbestos dust from asbestos-containing materials used in connection with the pumps and valves caused his fatal mesothelioma. (*Id.* at pp. 342-347.) The court rejected the claims, concluding that "a product manufacturer may not be held liable in strict liability or negligence for harm caused by another manufacturer's product unless the defendant's own product contributed substantially to the harm, or the

defendant participated substantially in creating a harmful combined use of the products." (*Id*. at p. 342.)

In assessing the scope of a manufacturer's liability for injuries arising from "adjacent" products, the court's attention centered on the strict liability doctrine. (*O'Neil*, *supra*, 53 Cal.4th at pp. 342, 348.) The court observed that from the outset, that doctrine had been premised on deficiencies in the defendant's own product, and that courts had generally rejected strict liability claims -- including "design defects" and "duty to warn" claims -- predicated on injuries from "entirely distinct" products neither made nor supplied by the defendant. (*Id*. at pp. 335-353.) The court took special note of *Taylor v. Elliot Turbomachinery Co., Inc.* (2009) 171 Cal.App.4th 564, 571-572 (*Taylor*), in which the widow of a U.S. Navy seaman sued several valve and pump manufacturers, alleging that they were responsible for her husband's asbestos-related injuries. (*O'Neil*, *supra*, at pp. 351-352.) In affirming summary judgment in favor of the defendants on the plaintiff's "duty to warn" strict liability claims, the appellate court in *Taylor* relied in part on the so-called "component parts doctrine," which shields the manufacturer of a component part from liability for injuries arising from a finished product into which the component has been integrated unless the component was defective when it left the manufacturer, or the manufacturer substantially participated in the integration of the component into the finished product. (*Taylor*, *supra*, 171 Cal.App.4th at pp. 570-571, 584-586.)

The *O'Neil* court distinguished three decisions in which liability had been imposed on a manufacturer, one of which is pertinent here, namely, *Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger* (2004) 129 Cal.App.4th 577, 579-

9

581 (*Tellez-Cordova*).[2]  There, the plaintiff asserted strict liability claims based on defective warnings and design defects against manufacturers of grinding, sanding, and cutting tools the plaintiff had used.  The plaintiff's complaint alleged that the defendants' tools released toxic dust from other manufacturers' products, and that the dust caused his injuries.  (*Ibid*.)  The defendants successfully demurred to the complaint on the basis of the component parts doctrine.  (*Id*. at p. 581.)  In reversing, the appellate court concluded that the component parts doctrine was inapplicable:  "The facts before us are not that respondents manufactured component parts to be used in a variety of finished products, outside their control,

---

[2]      The other two decisions were *Deleon v. Commercial Manufacturing & Supply Co.* (1983) 148 Cal.App.3d 336 (*Deleon*) and *Wright v. Stang Manufacturing Co.* (1997) 54 Cal.App.4th 1218, 1222 (*Wright*).  In *Deleon*, the plaintiff, a worker in a fruit processing plant, was injured when her arm was caught in a rotating power shaft located three feet above a fruit bin she had been cleaning.  (148 Cal.App.3d at pp. 340-341.)  She sued the bin's manufacturer, which obtained summary judgment on her strict liability claims.  (*Id*. at pp. 340-342.)  The appellate court reversed, concluding there were triable issues regarding the application of the component parts doctrine, as there was evidence the manufacturer had participated in the design of the production line that incorporated the bin.  (*Id*. at p. 345.)  In distinguishing *Deleon*, the *O'Neil* court noted that there was no evidence that the valve and pump manufacturers played such a role regarding the use of their products on warships.  (*O'Neil*, *supra*, 53 Cal.4th at p. 359.)

In *Wright*, the defendant manufactured a water cannon that had been mounted on a fire engine.  (*Wright, supra*, 54 Cal.App.4th at p. 1222.)  When the plaintiff, a firefighter, used the water cannon, it broke loose, threw him to the ground, and fell on him.  (*Ibid*.) The defendant obtained summary judgment on the plaintiff's strict liability claim on the theory that the cannon's mount, rather than the cannon itself, was defective.  (*Id*. at pp. 1222-1223.)  In reversing the grant of summary judgment, the appellate court concluded that there were triable issues whether the cannon suffered from a design defect because it was incompatible with a sufficiently strong mounting system; in addition, the court determined that there were triable issues whether the defendant had failed to warn about a potential mismatch between the cannon's water pressure and the strength of its mount.  (*Id*. at p. 1236.)  The *O'Neil* court concluded that *Wright* was distinguishable because the firefighter's injuries arose from a failure of the entire water cannon assembly, rather than from the failure of a component part not made by the defendant.  (*O'Neil*, *supra*, 53 Cal.4th at pp. 359-360.)

but instead that respondents manufactured tools which were specifically designed to be used with the abrasive wheels or discs they were used with, for the intended purpose of grinding and sanding metals, that the tools necessarily operated with those wheels or discs, that the wheels and discs were harmless without the power supplied by the tools, and that when the tools were used for the purpose intended by respondents, harmful respirable metallic dust was released into the air." (*Id*. at p. 582.)

The *O'Neil* court concluded that *Tellez-Cordova* marked an exception to the general rule barring imposition of strict liability on a manufacturer for harm caused by another manufacturer's product. (*O'Neil, supra,* 53 Cal.4th at p. 362.) That exception is applicable when "the defendant's own product contributed substantially to the harm." (*Ibid*.) In expounding the exception, the court rejected the notion that imposition of strict liability on manufacturers is appropriate when it is merely foreseeable that their products will be used in conjunction with products made or sold by others. (*Id*. at pp. 361-362.) The *O'Neil* court further explained: "Recognizing a duty to warn was appropriate in *Tellez-Cordova* because there the defendant's product was intended to be used with another product *for the very activity that created a hazardous situation.* Where the intended use of a product inevitably creates a hazardous situation, it is reasonable to expect the manufacturer to give warnings. Conversely, where the hazard arises entirely from another product, and the defendant's product does not create or contribute to that hazard, liability is not appropriate. We have not required manufacturers to warn about all foreseeable harms that might occur in the vicinity of their products." (*Ibid*.)

The *O'Neil* court further concluded the facts in *Tellez-Cordova* differed from the situation before it in two key respects. (*O'Neil*, *supra*, 53 Cal.4th at p. 361.) As the "sole purpose" of the power tools in *Tellez-Cordova* was to grind metals, they could only be used in a potentially injury-producing manner, unlike

11

the defendant manufacturers' pumps and valves, whose "normal operation . . . did not inevitably cause the release of asbestos dust." (*Id*. at p. 361) Moreover, unlike the pumps and valves, "it was the action of the power tools . . . that caused the release of harmful dust, even though the dust itself emanated from another substance." (*Ibid*., italics omitted.) In view of those differences, the pumps and valves did not satisfy two requirements identified by the underlying appellate court for the imposition of strict liability under *Tellez-Cordova,* namely, that the manufacturer's product "'is necessarily used in conjunction with another product,'" and that the "'danger results from the use of the two products together.'" (*Id*. at p. 361.) The *O'Neil* court determined that "[the] pumps and valves were not 'necessarily' used with asbestos components, and danger did not result from the use of [the] products 'together.'" (*Ibid*.)

After determining that the plaintiffs asserted no tenable strict liability claim, the *O'Neil* court turned to their negligence claims. (*O'Neil*, *supra*, 53 Cal.4th at p. 365.) The court declined to impose a duty of care, stating that "[t]he same policy considerations that militate against imposing strict liability in this situation apply with equal force in the context of negligence." (*Id*. at p. 366.)

### 3. *Relevant Post-O'Neil Decisions*

Following *O'Neil*, two appellate courts have applied the *Tellez-Cordova* exception was applicable to products liability claims resembling those presented here. In *Shields v. Hennessy Industries, Inc*. (2012) 205 Cal.App.4th 782, 784 (*Shields*), the plaintiffs' complaints asserted products liability claims predicated on allegations that they suffered injury due to exposure to asbestos dust released by the application of the AMMCO machine to asbestos-containing brake linings. The appellate court reversed judgments on the pleadings in favor of Hennessy, concluding that the plaintiffs' allegations satisfied the *Tellez-Cordova* exception to

12

the rule confining strict liability to a manufacturer's own products, as described in *O'Neil*. (*Shields, supra,* 205 Cal.App.4th at pp. 797-798.) The court stated: "Taken as true, the causes of action contend that Hennessy distributed a machine directly to consumers designed only to grind asbestos-containing brake linings, a machine that was defective because its intended operation necessarily released asbestos fibers into the air and was not a machine manufactured for use as a component in another finished product. . . . [T]he alleged sole and intended use of the brake arcing machine resulted in the release of contained asbestos particles." (*Id*. at p. 798, fn. omitted.)

In *Bettencourt v. Hennessy Industries, Inc.* (2012) 205 Cal.App.4th 1103, 1106-1110 (*Bettencourt*), which also involved products liability claims based on the AMMCO machine, the appellate court reached a similar conclusion. After Hennessy obtained judgments on the pleadings without leave to amend, the appellate court reversed, concluding that the plaintiffs' proposed amendments stated facts satisfying the *Tellez-Cordova* exception. (*Id*. at pp. 1110-1120.) According to the proposed allegations, "the sole and intended purpose" of the AMMCO machine "was to grind asbestos-containing brake linings. At the time in question, all brakeshoe linings used on automobiles and trucks in the United States contained asbestos, and it was not only foreseeable that [the] machines would be used to grind such linings, this was their inevitable use. The asbestos fibers bundles were physically bound in a matrix in the nonfriable linings, and only when subjected to the action of [the] machines were the fibers released into the air where they posed a danger to those exposed. Thus, when used as designed and intended, [the] machines caused the release of the toxic agent that injured plaintiffs, although that agent did not emanate from [the] machines." (*Id*. at p. 1117.)

13

C. *Parties' Showings*

We next examine the parties' showings, with special attention to the evidence bearing on the *Tellez-Cordova* exception.

### 1. *Hennessy's Evidence*

To establish that the *Tellez-Cordova* exception was inapplicable to petitioners' claims, Hennessy maintained that when David Greenberg allegedly worked with and around an AMMCO machine, asbestos-free brake linings were commercially available in the United States for use on automobiles and light trucks, and were, in fact, used with the machines. Hennessy relied primarily on declarations from automotive expert Russell Darnell, and Craig Mountz, a Hennessy engineer.

According to Darnell, asbestos-free brake linings have been available in the United States since 1936. In the 1930's and 40's, some domestic corporations obtained patents for such linings, and certain German-made cars used asbestos-free metallic linings. In the 1950's, asbestos-free linings were sold for use with trucks and the Chevrolet Corvette. In the 1960's and 1970's, asbestos-free metallic brake linings were available for the increasingly popular "muscle" cars and some passenger cars.

Mountz stated that AMMCO machines were designed to reshape a brake lining by mechanical abrasion, regardless of whether the lining contained asbestos. The machines themselves incorporated no asbestos-containing parts, and AAMCO otherwise never manufactured, designed, or marketed the brake linings to which the machine was applied. After AMMCO began making the machine, it manufactured abrasives and other components intended "to better tailor" the machine to certain metallic and high performance linings. In the 1960s, due to the

14

increasing presence of metallic and high performance linings, AMMCO created a special abrasive belt for high volume use of the machine with such linings.

### 2. *Petitioners' Evidence*

Petitioners contended their claims fell within the *Tellez-Cordova* exception, offering evidence (1) that the AMMCO machine "necessarily" caused dust, and (2) that during the pertinent period, due to the prevalence of asbestos-containing linings, it would have been "impossible" for a garage worker using the machine not to be exposed to asbestos dust. Their showing relied primarily on deposition testimony from Mountz.

Regarding the machine's creation of dust, Mountz stated that from the 1950's to 1987, the main body of the machine remained the same. Because when used as intended to grind brake linings the machines necessarily created dust, every machine was equipped with a dust collection system. The system consisted of a fabric bag until 1973, when AMMCO arranged for testing of the machine and introduced what it advertised as an "asbestos dust collector." Mountz acknowledged that the pre-1973 and post-1973 systems did not collect all the dust, and that workers using the machines were exposed to dust in "their breathing zone[s]."

Regarding a worker's likelihood of encountering asbestos dust, Mountz testified as follows:

"Q. . . . . [Y]ou agree that the *great majority* of brakes that were in use into the early 1980's, and even mid[-]1980's, contained asbestos, true? [¶] . . . [¶]

"[Mountz:] I'm not sure what year exactly, but yes. . .

"Q. Right. And . . . if you are a garage worker in the '50's, '60's, '70's, and into the mid 1980's, AMMCO understands that more likely than not, if you['re] working with a brake lining, it's got asbestos in it, true? [¶] . . . [¶]

15

"[Mountz:]  Probably.

"Q.  In fact . . . , it would be *basically impossible* for your average garage worker in the '50's, '60's, '70's, and into the '80's, to be working with an AMMCO grinder and never grind an asbestos brake.  Do you agree with that?

"[Mountz:]  Yes.

"Q.  In fact, AMMCO understood asbestos to be *so prevalent* in brakes, as of the 1970[']s, it actually referred to its dust collection system as an 'asbestos dust collector,' true?

"[Mountz:]  I believe so."  (Italics added.)

D.  *Analysis*

Our focus is on the *Tellez-Cordova* exception, even though that exception directly attaches to the rule shielding a product manufacturer from strict liability for injuries from "adjacent" products, as the grant of summary judgment relied solely on a determination that the exception is inapplicable.  We therefore limit our inquiry to whether the AMMCO machine "contributed substantially to the harm" (*O'Neil*, *supra*, 53 Cal.4th at p. 362).  For the reasons discussed below, we conclude that summary judgment was improperly granted.[3]

The *Tellez-Cordova* exception, as expounded in *O'Neil*, requires a special relationship between the manufacturer's product and the alleged harm.  *O'Neil* provides no definition of that relationship, but identifies factors relevant to its existence.  (*O'Neil, supra,* 53 Cal.4th at pp. 361-362.)  Although the *O'Neil* court

---

[3]     Although we may affirm the summary judgment on a ground not relied upon by the trial court if the parties have had an adequate opportunity to address that ground (*Byars v. SCME Mortgage Banker, Inc.* (2003) 109 Cal.App.4th 1134, 1147; Code Civ. Proc., § 437c, subd. (m)(2)), Hennessy has identified no ground unrelated to the *Tellez-Cordova* exception.

16

rejected the underlying appellate court's imposition of strict liability on the defendant manufacturers, the *O'Neil* court appears to have agreed that at least two factors proposed by the underlying court are required for the relationship, namely, that the manufacturer's product "'is necessarily used in conjunction with another product,'" and that "'danger results from the use of the two products together.'" (*O'Neil*, *supra*, at p. 361.) However, the *O'Neil* court explained the requisite relationship in more stringent terms, stating that a duty to warn was properly imposed in *Tellez-Cordova* because "the defendant's product was intended to be used with another product *for the very activity that created a hazardous situation.*" (*Ibid*.) Thus, such a duty is imposed when "the intended use of a product *inevitably* creates a hazardous situation," but not when that situation is merely foreseeable and is due solely to another product. (*Id*. at pp. 361-362, italics added.)

Petitioners' showing, if credited, establishes that the relationship between the AMMCO machine and the related harm closely resembles the product-harm relationship in *Tellez-Cordova*. For purposes of the strict liability doctrine, evidence regarding a product manufacturer's target market and "'marketing scheme'" is relevant to show the product's intended and foreseeable uses. (*Dosier v. Wilcox Crittendon Co.* (1975) 45 Cal.App.3d 74, 78-79.) According to petitioner's evidence, AMMCO designed the machine to grind drum brake linings for passenger cars and light trucks, the "great majority" of which contained asbestos. Indeed, Mountz acknowledged that they so frequently contained asbestos during the pertinent period that it was "basically impossible" for the average garage employee to avoid working with them. Although the machine could be used with all available drum brake linings for passenger cars and light trucks, AMMCO gave special attention to machine users who applied it to asbestos-containing linings, as AMMCO began to market an "'asbestos dust collector'" for the machine in 1973. That attention was unsurprising, as asbestos-containing drum

17

brake linings were "so prevalent."[4]  According to petitioners' evidence, because the machine necessarily created dust in its intended use, its application to the linings then available inevitably exposed the average garage employee to asbestos dust.

In our view, the product-harm relationship involving the AMMCO machine satisfies the factors identified in *O'Neil* for application of the *Tellez-Cordova* exception.  Petitioners' evidence shows that the AMMCO machine was necessarily used with a certain type of lining, and that asbestos dust resulted from that joint use.  Furthermore, the machine was intended to be used with drum brake linings "for the very activity" that generated the asbestos dust, the creation of which was "inevitabl[e]" -- rather than merely foreseeable -- due to the overwhelming prevalence of asbestos-containing linings.[5]  (Italics omitted.)

---

[4]     AMMCO's 1973 patent applications evidence its level of concern, as they state that uncollected dust from the machine created a "'definite health hazard,'" and that a serious problem existed "'because of the inherent danger to the persons using this type of equipment'" (see fn. 1, *ante*).

[5]     The AMMCO machine is thus distinguishable from matches and saws, which *O'Neil* states are outside the scope of the *Tellez-Cordova* exception.  In explaining why the exception is inapplicable when it is merely foreseeable that a product will be used in conjunction with another hazardous product, the *O'Neil* court stated that such a view "would require match manufacturers to warn about the dangers of igniting dynamite . . . . [¶] . . . California law does not impose a duty to warn about dangers arising entirely from another manufacturer's product, even if it is foreseeable that the products would be used together.  Were it otherwise, manufacturers of the saws used to cut [asbestos-containing] insulation would become the and valves in *O'Neil,* which did not cause the release of asbestos fibers, here, it was the grinding action of AMMCO's machine that generated the release of harmful asbestos next targets of asbestos lawsuits." (*O'Neil, supra,* 53 Cal.4th at p. 361.)  Unlike matches and saws, which are used with a wide array of different products, the AMMCO machine's role in the creation of the relevant hazardous condition was not merely foreseeable, but intended and contributed substantially to the condition itself.  Similarly, unlike the pumps and valves in *O'Neil,* which did not cause the release of asbestos fibers, here, it was the grinding action of AMMCO's machine that generated the release of harmful asbestos dust.

18

Hennessy contends that the *Tellez-Cordova* exception is inapplicable because the machine was designed to abrade all available drum brake linings for passenger cars and light trucks, regardless of the composition of the linings. Pointing to *Tellez-Cordova*, as well as *O'Neil*, *Shields*, and *Bettencourt*, Hennessy argues that a product falls outside the exception unless it can be used *only* in an injury-producing manner.  We disagree.

Because those decisions do not expressly impose Hennessy's proposed condition, to determine the scope of the *Tellez-Cordova* exception, we may properly examine the policies underlying the rule shielding a product manufacturer from strict liability for injuries due to an "adjacent" product.[6] (*O'Neil*, *supra*, 53 Cal.4th at p. 342.)  As explained in *O'Neil*, strict liability for such injuries is ordinarily imposed only on the manufacturer of the "adjacent" product, as product manufacturers generally lack continuing business relationships, and thus cannot exert pressure on one another to make safe products.  (*Id*. at p. 363)  Moreover, it is unfair to impose strict liability on manufacturers that derive no economic benefit from the sale of the injurious product.  (*Ibid*.)

---

[6]     None of the cited decisions required satisfaction of the proposed condition.  In *Tellez-Cordova*, which addressed the legal adequacy of products liability claims in the context of a demurrer, the appellate court found that the complaint's allegation that the pertinent tools "had no function without the abrasives which disintegrated into toxic dust" sufficed to state strict liability claims.  (*Tellez-Cordova, supra*, 129 Cal.App.4th at p. 585.)  In *O'Neil*, the court distinguished *Tellez-Cordova* from the factual situation presented to it by reference to that allegation, but did not expressly confine the *Tellez-Cordova* exception to products possessing a sole or unique harm-producing purpose or function.  (*O'Neil*, *supra*, 53 Cal.4th at pp. 361-362.)  *Shields* and *Bettencourt*, which also addressed the legal adequacy of products liability claims in the context of a demurrer, concluded only that such an allegation sufficed for the imposition of liability.  (*Shields*, *supra*, 205 Cal.App.4th at p. 798; *Bettencourt*, *supra,* 205 Cal.App.4th at p. 1107.)

19

Although *O'Neil* does not discuss the policy rationale underlying the *Tellez-Cordova* exception, the key consideration relevant to it appears to be derived economic benefit, as nothing in *Tellez-Cordova* suggests that the tool manufacturer there had continuing business relationships with the manufacturers of the other relevant products. Because the manufacturer's tool was useable only with certain other products, it indirectly derived economic benefit from their sale. Accordingly, as the combined use of the tool with those products inevitably created a hazardous condition, it was fair to require the tool manufacturer to share liability for the resulting injuries.

Here, AMMCO derived a similar economic benefit from the sale of asbestos-containing drum brake linings as the tool manufacturer in *Tellez-Cordova* reaped from the sale of the products on which its grinders, sanders and saws operated. Because asbestos-containing drum brake linings were "so prevalent" during the pertinent period, Sherman's use of the machine "for the very activity that created a hazardous situation" was not merely possible, but inevitable. We find the relevant question not whether asbestos-containing brake linings were "necessary to the operation of AMMCO's machine," but whether someone using the grinder as intended during the period in question would invariably have been subjected to asbestos dust. On this record, the answer is "yes."

Hennessy's reliance on this court's decision in *Sanchez v. Hitachi Koki, Co., Ltd.* (2013) 217 Cal.App.4th 948 is misplaced. There, a worker, disregarding express warnings to the contrary, inserted a saw blade into a power grinder, and suffered injury from the saw blade while using the grinder. (*Sanchez v. Hitachi Koki, Co., Ltd., supra,* 217 Cal.App.4th at pp. 950-951.) He asserted products liability claims against the grinder's manufacturer, which sought summary judgment under *O'Neil* on the ground that it neither made nor sold the blade, and that the grinder was never intended to be used with a saw blade. (*Id*. at p. 952.) In

affirming the grant of summary judgment, this court concluded that *O'Neil* barred imposition of liability on the manufacturer for the worker's conceded misuse of its product. (*Id*. at pp. 954-959.) Distinguishing *Tellez-Cordova,* we noted that "[Plaintiffs'] own expert opined that the grinder was *not* intended to be used with a saw blade, and the manual expressly warned that use of a saw blade was 'dangerous and may cause personal injury or property damage.'" (*Id.* at p. 957.) In contrast, as explained above, petitioners' claims are predicated on the *intended* use of the AMMCO machine, and thus fall within the *Tellez-Cordova* exception.[7]

---

[7]    The other decisions upon which Hennessy relies also are distinguishable. Most exemplify the component parts doctrine, which is inapplicable here because the AMMCO machine cannot reasonably be regarded as a component of a finished product over which AMMCO lacked control. (*Garman v. Magic Chef, Inc.* (1981) 117 Cal.App.3d 634, 637-638 [propane stove manufacturer had no duty to warn regarding hazards associated with pipe connecting stove to propane tank when it did not supply or install pipe]; *Powell v. Standard Brands Paint Co.*, *supra*, 166 Cal.App.3d at pp. 360-367 [manufacturer of paint thinner used in construction project was not liable for injuries arising from use of similar thinner made by another manufacturer]; *Garcia v. Joseph Vince Co.* (1978) 84 Cal.App.3d 868, 872-880 [manufacturer of fencing mask was not liable for injuries arising from use of defective fencing sabre made by another manufacturer]; *Blackwell v. Phelps Dodge Corp.* (1984) 157 Cal.App.3d 372, 377-378 [acid manufacturer had no duty to warn about dangers of pressure formation from acid when manufacturer lacked control over shipping arrangements, and placed the acid as ordered in defective tank cars provided by other parties]; *Wiler v. Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 627-629 [supplier of tires lacking valves was not liable for injuries arising from defective valve, as intermediate manufacturer attached valve to tire before providing it to injured party]; *McGoldrick v. Porter-Cable Tools* (1973) 34 Cal.App.3d 885, 888-891 [manufacturer of saw stand was not liable for injuries arising from defective saw made by another manufacturer]; *Zambrana v. Standard Oil Co.* (1972) 26 Cal.App.3d 209, 216 [tire manufacturer was not liable for injuries due to tire valve extension made by another manufacturer].)

All but one of the remaining cases stand for the general proposition that absent special circumstances, a defendant that neither makes nor distributes a defective product is not liable for injuries arising from that product. (*Peterson v. Superior Court* (1995) 10 Cal.4th 1185, 1188 [hotel was not liable for injuries arising from defective bathtub in hotel room]; *Ontiveros v. 24 Hour Fitness USA, Inc.* (2008) 169 Cal.App.4th 424, 426-
*(Fn. continued on next page.)*

21

Hennessy also contends that petitioners cannot establish another fact crucial to the *Tellez-Cordova* exception, namely, that the relevant brake linings were safe absent the use of the AMMCO machine. The crux of Hennessy's argument is that the allegations in petitioners' complaint, coupled with their discovery responses, foreclose their ability to demonstrate that fact. As explained below, we disagree.[8]

Our focus is on whether petitioners can show that the pertinent brake linings did not release unsafe amounts of asbestos fibers in their ordinary baseline state,

---

435 [fitness club was not liable for injuries arising from defective exercise machine]; *Cadlo v. Owens-Illinois, Inc*. (2004) 125 Cal.App.4th 513, 523-524 [former supplier of asbestos insulation to Navy was not strictly liable for seaman's injuries from exposure to asbestos insulation, absent evidence that former supplier had role in the design and marketing of asbestos insulation to which seaman was actually exposed].) As explained above, petitioners' showing, if credited, is sufficient to establish the *Tellez-Cordova* exception to that general proposition.

The remaining decision stands for the proposition that a product manufacturer is not liable for injuries due to modifications of the product by a sophisticated purchaser aware of the potential dangers arising from the modifications. (*Fierro v. International Harvester Co.* (1982) 127 Cal.App.3d 862, 865-869 [manufacturer of skeletal truck chassis had no duty to warn packing company that modifying the chassis's battery system could create a fire hazard].) Nothing before us suggests that petitioners constitute such sophisticated purchasers.

[8] In seeking summary judgment, "a defendant may rely on the complaint's factual allegations, which constitute judicial admissions. [Citations.] Such admissions are conclusive concessions of the truth of a matter and effectively remove it from the issues." (*Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217, 222, fn. 3.) However, an allegation that is not dispositive regarding a matter does not preclude the plaintiff from offering additional evidence. (*Electronic Equipment Express, Inc. v. Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 850.) Similarly, a party seeking summary judgment may rely on the opponent's discovery responses, but summary judgment "'should not be based on tacit admissions or fragmentary and equivocal concessions, which are contradicted by other credible evidence.' [Citations.] To protect the interests of the party opposing summary judgment, its 'admissions[, if any,] should be . . . careful[ly] examin[ed] in light of the *entire* record.' [Citations]." (*Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 473.)

absent the operation of the AMMCO machine.[9]   As Hennessy notes, in *Tellez-Cordova*, *Shields,* and *Bettencourt*, the allegations identified as sufficient to state a products liability claim included an allegation that the products to which the pertinent tool or machine was applied released no hazardous dust when the tool or machine was not operating.  (*Tellez-Cordova*, *supra*, 129 Cal.App.4th at p. 585; *Shields*, *supra*, 205 Cal.App.4th at p. 797; *Bettencourt*, *supra*, 205 Cal.App.4th at p. 1117.)  Hennessy argues that petitioners cannot establish that fact, in view of their complaint and discovery responses.  Petitioners' complaint alleges that the "sawing, chipping, hammering, scraping, sanding, breaking, removal, 'rip-out', and other manipulation" of asbestos-containing products "result[s] in the release of airborne asbestos fibers . . . ."  Furthermore, in response to an interrogatory seeking "[a] complete description of [the] work" that exposed Greenberg to asbestos,

---

[9]     We observe that Hennessy's contention -- as Hennessy itself has acknowledged -- is directed at the propriety of the imposition of strict liability, not petitioners' ability to prove causation of their injuries.  Generally, to establish a strict products liability claim, the plaintiff must prove that "there was a defect in the manufacture or design of the product *and* that such defect was a proximate cause of the injuries."  (*Cronin*, *supra*, 8 Cal.3d at p. 133, italics added.)  Although the evidence regarding those elements may overlap, they are distinct requirements.  (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572-573; *Doupnik v. General Motors Corp.* (1990) 225 Cal.App.3d 849, 862-864.)  Beyond showing an "abstract 'defect'" in the product, the plaintiff must demonstrate that the defect was appropriately causally related to the alleged injuries.  (*Soule*, *supra*, 8 Cal.4th at pp. 572-573.)  Specifically, in an action based on injuries attributed to asbestos from potentially more than one source, to establish proximate causation regarding a manufacturer's product, the plaintiff must show a threshold exposure to asbestos from the product, and a reasonable medical probability that a particular exposure or series of exposures was a substantial factor in bringing about the risk of the alleged injuries.  (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 982.)  As Hennessy's contention concerns the *Tellez-Cordova* exception, it targets petitioners' ability to demonstrate an essential predicate for an "abstract" defect in the AMMCO machine itself, specifically, that it was capable of generating exposures to asbestos fibers satisfying the requirement for proximate causation.

petitioners replied: "Sanding, grinding, abrading, use of compressed air, brake and clutch inspections, cleaning up, including sweeping, cleaning off clothes, cleaning out hair, opening boxes, cleaning off tools and equipment."[10]

Although those allegations and responses show that various activities on the linings could release asbestos fibers, they do not establish the extent to which the linings in their baseline state emitted fibers, absent such activities. Furthermore, the record discloses evidence that the AMMCO machine's operation itself was responsible for the emission of hazardous levels of asbestos fibers. According to petitioners' showing, Mountz testified as follows:

"Q. . . .[¶] AMMCO agrees that the hazard when working with brake linings *isn't from just being next to one or holding one*, the hazard, as it pertains *specifically* to AMMCO, is grinding that brake lining, true? [¶] . . . [¶]

"[Mountz:] It's when the dust becomes airborne, *yes*." (Italics added.) That testimony is sufficient to raise triable issues whether the linings were safe in the

_____

[10] To the extent Hennessy contends that under the *Tellez-Cordova* exception, appellants must establish that the brake linings released asbestos fibers *only* when abraded by the AMMCO machine, we disagree. In *Tellez-Cordova*, the products liability claims involved multiple metal working machines that performed different operations on metal parts, including grinding, sanding, and cutting. (*Tellez-Cordova, supra,* 129 Cal.App.4th at p. 579.) The appellate court held that liability was properly imposed on the machines' manufacturers for injuries due to each type of machine, although they created toxic dust through distinct operations. Thus, the *Tellez-Cordova* exception is applicable to a machine that releases asbestos fibers from brake linings, even though other operations on the brake linings also released asbestos fibers, provided that the linings were safe in their baseline state.

24

absence of grinding activity upon them.  We therefore conclude that summary judgment was improperly granted.[11]

[11]     In a related contention, Hennessy maintains that petitioners cannot establish "defective design" claims based on purported defects in the "asbestos dust collector" introduced in 1973.  Hennessy argues that any such claim fails for two reasons, namely, that the AMMCO machine Greenberg owned was equipped with the pre-1973 dust collection system, and that liability cannot be imposed on Hennessy with respect to *any* dust collection system because petitioners' injuries are attributable solely to asbestos-containing products AMMCO neither made nor distributed.  We reject Hennessy's contention.

The record discloses that petitioners assert no claim specifically predicated on a design defect in the 1973 "asbestos dust collector."  Petitioners state in their reply brief that they allege only that the pre-1973 dust collection system reflected a defect in the AMMCO machine used by Greenberg.  For the reasons discussed above, petitioners' showing is sufficient to demonstrate that the *Tellez-Cordova* exception encompasses such a claim, that is, that the AMMCO machine used by Greenberg "contributed substantially to the harm" (*O'Neil*, *supra*, 53 Cal.4th at p. 362).  *Macias v. Mine Safety Appliances Co.* (2010) 158 Wn.App. 931 [244 P.3d 978], reversed by *Macias v. Saberhagen Holdings, Inc.* (2012) 175 Wn.2d 402 [282 P.3d 1069], to which Hennessy directs our attention, is distinguishable, to the extent that decision stands for the proposition that a manufacturer of a safety device intended to mitigate a hazard created *solely* by another manufacturer's product is not liable for injuries due to the hazard.  (See *Macias, supra,* at pp. 942-949 [244 P.3d at pp. 985-986] [respirator manufacturer of respirators not liable for worker's mesothelioma caused by exposure to asbestos-containing products made by others].)

**DISPOSITION**

Let a peremptory writ of mandate issue directing that respondent trial court vacate its order granting Hennessy's motion for summary judgment, and enter a new order denying summary judgment and summary adjudication. The alternative writ, having served its purpose, is discharged. Petitioners are awarded their costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.

26